FREDERICKA HOMBERG WICKER, Judge.
[i>This Court is intimately familiar with the facts of this case as it has had a long and protracted history, spanning over a period of seventeen years. In 1998, we affirmed the trial court’s ruling and determined that the provision of the decedent’s testament disinheriting a forced heir was invalid. Succession of Linder, 97-1269 (La.App. 5 Cir. 6/30/98), 717 So.2d 1276 (unpublished) (Linder I). Then, in 2002, we affirmed the trial court’s ruling that the decedent had testamentary capacity, that the statutory testament was valid as to form, that the plaintiff failed to prove undue influence in the execution of the will, and that denied the forced heir’s request to annul the probated testament. Succession of Linder, 02-106 (La.App. 5 Cir. 7/30/02), 824 So.2d 523 (Linder II). In 2006, we dismissed the executor’s appeal from the trial court’s denial of his exception of prescription as to the plaintiffs claim for reduction of excessive donations, finding that the interlocutory judgment was not appealable and remanded the matter to the trial court. Succession of Linder, 05-640 (La.App. 5 Cir. 2/14/06), 924 So,2d 293 (Linder III). Finally in 2008, we vacated the judgment of possession that was rendered by the trial court lson June 18, 2007 and remanded the case to the trial court. Succession of Linder, 08-394 (La.App. 5 Cir. 10/14/08), 994 So.2d 148 (Linder IV).
Now, the parties are back before us for the fifth time on appellant’s, Mrs. Jane L. Rosenthal’s, appeal of the trial court’s November 16, 2010 judgment, denying her Opposition to the Final Tableau of Distribution and Request for Reduction and Recalculation of Mass Estate.
During the pendency of Linder IV, the executor/appellee, Mr. Leo Guenther, filed a Petition for Homologation of Final Account on November 16, 2007, covering the period from January 1, 2007 through November 15, 2007. Although the trial court ordered the final account homologated on December 10, 2007, Mrs. Rosenthal opposed the homologation the following day. Mr. Guenther opposed the opposition on January 9, 2008, arguing that Mrs. Rosen- *1161 thal’s opposition to the final account was untimely. After continuances and other delays, the trial court heard Mrs. Rosen-thal’s Opposition to the Final Tableau of Distribution and Request for Reduction and Recalculation of Mass Estate on June 18, 2010.
At the conclusion of the trial, the court took the matter under advisement and rendered its judgment, with written reasons, on November 16, 2010, denying Mrs. Ro-senthal’s opposition in part and granting it in part. The trial court denied Mrs. Ro-senthal’s request to revalue the oil and gas interests and accepted the valuation of $2,949.00 as depicted in the Amended and Restated Sworn Descriptive List. The court also denied Mrs. Rosenthal’s request to reduce all particular legacies as well as her request to find that Mr. Guenther breached his fiduciary duty. The trial court ordered the final tableau be amended to reflect the following:
ASSETS $69,046.41
DEBTS DUE ON DATE OF DEATH $21,745.00
FUNERAL EXPENSES $ 3,773.55
J^LEGAL CHARGES $ 1,657.00
NET ESTATE $41,870.86
FORCED PORTION (1/4) $10,467.72
DISPOSABLE PORTION (3/4) $31,403.14
Mrs. Rosenthal moved for new trial on November 80, 2010, on the issues of the valuation of the estate’s mineral interests, the calculation of the value of the estate, the method of satisfying her legitime, and on whether Mr. Guenther breached his fiduciary duty. The court denied the motion on January 20, 2011. Mrs. Rosenthal moved to designate the November 16th judgment as final. The trial court designated the judgment final and appealable pursuant to La. C.C. art. 1915. This appeal follows.
Assignments of Error
Ms. Rosenthal assigns seventeen errors. Specifically, she contends that the district court erred by:
1. valuing Mrs. Linder’s mineral interests at $2,949.00 on the date of her death, when they were actually worth $2,549,571.00;
2. rejecting the appraisals that included information developed after the date of Mrs. Linder’s death;
3. calculating Mrs. Linder’s aggregate estate to be worth $69,046.41.00;
4. calculating Mrs. Linder’s estate’s net value to be $41,870.86;
5. calculating her legitime to be worth $10,467.72;
6. failing to reduce all of Mrs. Lin-der’s will’s legacies under La. C.C. art. 1511 to pay for her legitime;
7. failing to give her an undivided one-fourth of the Succession’s oil and gas interest;
| r,8. failing to give her an undivided one-fourth of the past and future royalties;
9.failing to require the particular legatee, Mr. Guenther, to return the oil and gas royalties accruing on his legacy under La. C.C. art. 1515;
10. finding that her legitime should be satisfied solely from the residue of the succession that would otherwise have been paid to Touro Synagogue, the residuary legatee;
11. finding that Mrs. Linder expressed a preference in her will under La. C.C. art. 1512 to pay an undisclosed forced heir her legitime solely from the residuary legacy;
12. failing to award her interest from the date she opposed the disinheri-son and demanded her legitime;
13. finding that Mr. Guenther had fulfilled his fiduciary duty; and
*1162 14. failing to award her damages for Mr. Guenther’s breach of fiduciary duty.
She then argues in the alternative that the district court erred in:
15. finding that Mrs. Linder’s estate was solvent because its liabilities significantly exceeded its assets, and the estate was only rendered solvent by Mr. Guenther’s agreement to pay certain [sic] of its expenses;
16. finding that Mrs. Linder’s estate was solvent because it impermissi-bly reduced the estate’s liabilities by removing post-death expenses from its Article 1505 calculation; and
17. failing to find that all of Mrs. Lin-der’s testaments lapses because the estate was insolvent.
| Trial Testimony
Mr. Terry A. Johnston, of Atwater Consultants, Mr. Mike McKenzie, of Seek Production, LLC., and Mr. Guenther testified at the trial.
Mr. Johnston testified as an expert in petroleum engineering and mineral interest valuations and first became involved in the case as the court appointed appraiser. Pursuant to his appointment, Mr. Johnston provided the first appraisal — Atwater I— on May 17, 2005, which reflected a fair market value of $2,949.00 on the date of death, November 30,1994. He was subsequently hired by Mrs. Rosenthal to complete additional appraisals. On May 17, 2005, he completed another appraisal in which the estate’s oil and gas interests were valued at $261,528.00 as of March 1, 2005 (Atwater II). He then completed a March 4, 2008 appraisal which valued the oil and gas interests at $2,495,989.00 (At-water III) and a June 14, 2010 appraisal which valued the interests at $2,549,571.00 (Atwater IV). Of the four appraisals, Mr. Johnston testified that Atwater I was the only appraisal that reflected a fair market value on the date of death. Atwater II reflected a fair market value as of March 1, 2005, while Atwaters III and IV reflected true values on the date of death. Mr. Johnston explained that a fair market valuation is restricted to the use of information that is available on a specified date, while true value works backward to determine an asset’s worth on a previous date as opposed to what the asset was perceived to be worth at that time.
In Atwater I, Mr. Johnston stated that the fair market value of the estate’s oil and gas interests on the date of death was $2,949.00. He explained, however, that Atwater I only considered the mineral reserves actually produced during the years preceding Mrs. Linder’s death. In Atwa-ter IV, however, he testified that he used post-production analysis, which involved a two-fold process. First, he took the sum of the total income derived from the sale of the oil and gas attributable to the 17mineral royalty interests the Succession owned in November 1994 until on or about June 1, 2010, which totaled $8,242,589.00. He then discounted that figure back to the date of death at a rate of 8 percent and determined the true value to be $2,395,111.00. He then determined the current fair market value of the remaining income as of April 1, 2010, and discounted that value back to the date of death to obtain the true value, which he determined to be $154,460.00. Finally, he took the sums of both true values and determined that the true value on the date of death was $2,549,571.00. Although he determined that this was what the mineral interests were actually worth in 1994, he testified that no quantifiable data existed at that time to suggest that the mineral reserves exceeded what was generally thought at the time.
*1163 Mr. Mike McKenzie testified as an expert in the field of geology and valuation of reservoirs. His report dated October 2, 2009, estimated the value of the produced volumes from November 30, 1994 through July 31, 2009, as well as the future proved developed producing and undeveloped reserves subject to the Succession. Mr. McKenzie testified that he used the decline curves method and incorporated the date of death prices of $18.07/BBL for oil and condensate and $1.75/MCF for gas to obtain a total proved value of $2,066,397.00. He then discounted that amount at a rate of 10 percent to the date of death to compute a present value of $560,476.00. He opined that the variance which existed in his appraisal and Atwater’s appraisals could be attributed to the fact that Atwa-ter utilized the increased prices as opposed to the date of death prices. He further stated that his October 2, 2009 appraisal was based on present value and not fair market value.
laDiscussion
Before addressing the merits of the appeal, we must first determine whether it is properly before this Court.
The trial court designated the November 16, 2011 judgment as final and appeal-able pursuant to La. C.C.P. art.1915. The order designating the judgment final stated, “[ujpon considering the facts of this case and the applicable law, including the factors announced in R.J. Messinger v. Rosenbloom [sic], 04-1664 (La.3/2/05); 894 So.2d 1113, the court finds, for the reasons set forth in Rosenthal’s supporting memorandum, that there is no just reason for delay” (emphasis added).
The proper standard of review for an order designating a judgment as final for appeal purposes when accompanied by explicit reasons is whether the trial court abused its discretion. Royal Oldsmobile Co., Inc. v. Heisler Prop., L.L.C., 10-152 (La.App. 5 Cir. 12/28/10), 58 So.3d 483, 489. However, if no reasons are given but some justification is apparent from the record, the appellate court should make a de novo determination of whether the certification was proper. Id. citing R.J. Messinger, Inc. v. Rosenblum, 04-1664, pp. 13-14 (La.3/2/05), 894 So.2d 1113, 1122. In this case, the order designating the judgment as final is accompanied by explicit reasons — those set forth in Mrs. Rosen-thal’s supporting memorandum. Therefore, we must determine whether the trial court abused its discretion by designating the judgment as final. After a careful review of the record, particularly Mrs. Ro-senthal’s supporting memorandum, we find that the trial court did not abuse its discretion and properly designated the judgment as final.
1 JPirst, Second, and Third Assignments of Error
Mrs. Rosenthal first contends that the trial court erred in valuing the Succession’s oil and gas interests at $2,949.00; by rejecting appraisals that considered information developed after the date of death; and by calculating the net estate to be worth $69,046.41. Thus, our initial inquiry here is to determine whether the trial court erred in accepting $2,949.00 as the fair market value of the oil and gas interests on the date of death.
It is well settled that, on appellate review of a factual determination, the reviewing court may not set aside the trier’s findings of fact in the absence of manifest error or unless he is clearly wrong. Succession of Gilbert, 95-426, p. 5-6 (La.App. 5 Cir. 1/30/96), 668 So.2d, 1212, 1215, writ granted, 96-0949 (La.2/7/97), 689 So.2d 1314. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether his conclusion was a reasonable one. Id. citing Stobart v. State through DOTD, 617 *1164 So.2d 880 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id.
In order “to determine the reduction to which the donations, either inter vivos or mortis causa, are subject, an aggregate is formed of all property belonging to the donor or testator at the time of his death.” La. C.C. art. 1505. The decedent’s property must, therefore, be appraised for market value[1] as of the date of death.[2] One of the complexities in this case, however, is the fact that the record is clouded with five appraisals which depict varying values of the estate’s oil and gas interests, i.e. “fair market value,” “true value,” and “present value.” In this | ¶ ncase, Atwater Consultants provided four appraisals. Atwater I reflects a “fair market value” on the date of death; Atwater II reflects a “fair market value” as of March 1, 2005; and Atwaters III and IV reflect a “true value” on the date of death. The fifth appraisal, provided by Seek Production, LLC., reflects an appraisal based on “present value” on the date of death. Thus, we must first determine what difference, if any, exists between these values.
Mrs. Rosenthal contends that “true value” and “fair market value” are synonymous and urges this Court to adopt Atwa-ter IV, which depicts a “true value” on the date of death of $2,549,571.00. Mrs. Ro-senthal relies on Black’s Law Dictionary to support her contention that these terms have the same meaning. Although Black’s Law Dictionary defines the terms identically, Mrs. Rosenthal’s reliance on such is misplaced in light of the jurisprudence that clearly states that values are established on the date of death. See Succession of Songne, 94-1198, p. 4 (La.App. 3 Cir. 11/2/95), 664 So.2d 556, 559, (the proper time for determining the value of the forced portion is the date of the decedent’s death.); Succession of Pratt, 97-580 p. 7 (La.App. 5 Cir. 11/25/97), 704 So.2d 310, 313, (“ ‘active mass, legitime’ and ‘disposable portion’ on an estate are calculated with reference to the value as of the date of death.”) (emphasis in original).
Atwater IV defines “true value” as “the amount that a future sum of money is worth on some given date for a specified rate of return.” (emphasis added). Mr. Johnston explained that in order to compute the “true value” in Atwater IV, he considered the total sum derived from the sale of oil and gas interests from November 1994 through June 2010. So based on his report and testimony, it is apparent that Atwater IV used information obtained subsequent to the date of death to compute the “true value.” Thus, it stands to reason that if values are set on the date of death, those values subsequently obtained cannot be used to calculate the |uvalue of the estate’s oil and gas interests on the date of death. In spite of this, however, Mrs. Rosenthal states that even if the oil and gas were not being produced on the date of death, they were in fact, present in the ground on that date and we should therefore consider the information obtained subsequent to the date of death to value the oil and gas interests.
The Amended Descriptive List in this case values the oil and gas interests at $2,949.00. La. C.C.P. art. 3136 provides that the descriptive list of succession property shall be accepted as prima facie proof of all matters shown therein, unless amended or traversed successfully. Suc *1165 cession of Hebert, 03-0531, 03-0532 (La.App. 1 Cir. 9/17/04), 887 So.2d 98,100, writ denied, 04-2571 (La.12/17/04), 888 So.2d 872. However, any interested party may traverse the descriptive list at any time. Id. The burden, however, is on the party filing a motion to traverse to show that the descriptive list is in error. Succession of Feitel, 05-1482 (La.App. 4 Cir. 4/18/07), 958 So.2d 58, 60, writ denied, 07-1046 (La.8/31/07), 962 So.2d 436. It was therefore incumbent upon Mrs. Rosenthal' to prove the inaccuracy of the value assigned to the oil and gas interests.
Mrs. Rosenthal opposed the final tableau in December of 2007, but the matter was not heard until June of 2010. Therefore, she has had ample opportunity to conduct discovery in order to determine what was known or what reasonably could have been learned by a willing buyer about the reserves which were actually in the ground on November 30, 1994 — the date of her mother’s death. Yet, she failed to present any evidence to show that the fair market value was anything other than $2,949.00 on the date of death nor has she presented any evidence that a willing buyer could have learned, on November 30, 1994, that the estate’s unit well was capable of producing more than it had produced in the years preceding and immediately following her mother’s death. In fact, her own expert testified that no 112quantifiable data existed on November 30, 1994, to support the finding that the reserves exceeded what people generally thought at that time. To now say, eighteen years later, that Mrs. Rosenthal is entitled to increase the fair market value of the oil and gas interests based on information later obtained would be untenable. As the trial court stated in its reasons for judgment:
[t]he law requires this Court to determine the fair market value of the mineral interests as of the date of death, thereby precluding the consideration of information obtained years later. Any other finding would allow the value of the disposable portion and legitime to continuously fluctuate until the heirs are finally placed in possession. Such a finding would cause great uncertainty and is simply contrary to law.[3]
Yet, Mrs. Rosenthal maintains that information available after her mother’s death should be used in the estate’s valuation to account for the tremendous appreciation of the oil and gas interest. To support this proposition, she cites Succession of Dorand, 94-1627 (La.App. 4 Cir. 7/26/95), 659 So.2d 523 where the court ordered a reduction in the value of an estate after the date of death to better reflect the estate’s value as it existed at the time of death.
In Dorand, the decedent owned 100 shares of stock in a closely held corporation which were depicted on the sworn descriptive list as having a date of death value of $162,925.08. The trial court determined, however, that the executor had overvalued the stock and therefore ordered a reduction. On appeal, the Fourth Circuit noted that the executor’s valuation failed to take into account unpaid IRS back taxes as well as the prior three years’ operating losses which were both pending and exigible before the decedent’s death. The Fourth Circuit noted:
*1166 “[Generally, events occurring after the death of the deceased should not affect the value of stock for purposes of a descriptive list | ^valuation. Cf. Succession of Katakura, 621 So.2d 893 (La.App. 4th Cir.1993). However, in the instant case, the after-death debt incurred in liquidating the business, and any losses incurred during the operating of the business pending liquidation, were evidence bearing on the fair market value of the stock as of the time of death ...” (emphasis added).
Dorand, supra, at 525.
Thus, the court clarified that although the value of the stock was being adjusted after the time of death, the valuation was based on information readily available at the time of death — i.e., costs associated with liquidating a corporation.
Unlike Dorand, Mrs. Rosenthal produced no evidence that the information used to seek a post-mortem increase in value is information that was available when Mrs. Linder died. Thus, the presence of the dormant mineral reserves in the ground at the time of Mrs. Linder’s death is irrelevant. In this case, there just simply was not a vast amount of production occurring during the years preceding and immediately following Mrs. Linder’s death. The record is void of any evidence which suggest that, in November of 1994, the unit well was capable of producing more than it was. There was no evidence produced at trial that information existed in November of 1994 that would have increased the value of the mineral interests. And because there was no evidence of knowledge of information in 1994 that could have proven the existence of “millions of feet in recoverable oil and gas”[4] owned by Linder on the date of her death, subsequent information proving the existence of those minerals cannot be considered in valuation.
In sum, post-mortem information, unbeknownst to the parties and discovered subsequent to the date of death, may not be used to re-value an estate since the succession is “calculated as of the date of death,” regardless of appreciations of |14value. Pratt, supra, at 313. We, therefore, find that the trial court did not err in accepting $2,949.00 as the “fair market value” of the oil and gas interests on the date of death. And because this was the only asset in dispute, we, likewise, find that the trial court did not err in its factual finding that the estate’s assets on the date of death totaled $69,046.41. Therefore, these assignments of error are without merit.

Fourth and Fifth Assignments of Error

Next, Mrs. Rosenthal contends that the trial court erred in calculating the estate’s net estate to be worth $41,870.86 and in calculating her forced portion to be worth $10,467.72. She contends that the active mass[5] is actually worth $2,615,668.40, thereby increasing the forced portion to $647,123.22.
Universal and particular legatees are entitled to post-value appreciations in the value of their own legitimes. Pratt, supra. This Court expounded on this principle in Pratt — a case upon which Mrs. Rosenthal relies. Mrs. Rosenthal expands the Pratt holding however to suggest that a forced heir is entitled to any post-death increase in the value of legitimes by way of increasing the value of the active mass, leading to an appreciation of the forced portion. Mrs. Rosenthal’s interpretation of Pratt is *1167 incorrect, however. Rather than holding that forced heirs are generally entitled to post-death increases in legitimes, the holding was narrower. In Pratt, we determined that forced heirs, as universal legatees, are entitled to value appreciations in their own legitimes, as opposed to an appreciation of the active mass by way of the increase in value of another legitime.
In Pratt, a testator’s testament specified that his daughter, Catherine, was to receive the minimum amount of the estate that was required by law. The testament further specified the assets to be used for her bequest. The testament also 1 ^purported to disinherit the decedent’s other daughter, Anne, but this court held that the disinherison clause was invalid. There, we determined that Anne was a forced heir, and thus, a universal legatee. Catherine, however, was a particular legatee since her portion was to be satisfied by certain assets.
In that case, we held that the particular and universal legatees were entitled to post-death increases and decreases in the valuation of their legitimes. Id. Specifically, we stated, “... Ms. Pratt is entitled to any post-death increase in the value of her legitime ” (emphasis in original) and “... [Catherine] is entitled to post-death increases in values of the particular assets bequeathed to her.” Id. at 313. Our holding markedly differed from the Pratt daughters’ contention that the increases in their legitime should be used to increase the value of the active mass of the estate. The Pratt heirs were entitled to the increase of the assets only in their respective legitimes. We specifically stated so in Pratt and further held that “we [saw] no error in the trial court’s calculation of the active mass of the succession, which was based on the valuation of the assets as of the date of decedent’s death ...” (emphasis in original). Id.
Like the daughters in Pratt, Mrs. Rosenthal misinterprets our holding to mean that the post-death appreciation of Mr. Guenther’s particular legacy should increase the value of the active mass, and thus, the value of her forced portion. As explained, however, that was not our holding. Rather, the Pratt case specifically stated that the active mass of the estate was based on assets valued at the time of death but that each legatee was entitled to the increased value in the assets under their legitime. Once the value of the active mass is calculated at the time of death, and the legitimes are allocated, the active mass cannot be increased by appreciations in the value of individual legitimes. To hold otherwise would Ineffectively value the active mass after the time of death, which is specifically prohibited by Pratt, pursuant to La. C.C. art. 1505. Id. at 313.
As Pratt is applied to this case, Mrs. Rosenthal is entitled to any increases in the assets within her legitime, and Mr. Guenther is entitled to any increases in the value in his legitime. Mrs. Rosenthal’s legitime, however, does not consist of the mineral interests specifically bequeathed to Mr. Guenther. Thus, under Pratt’s specific holding, Mrs. Rosenthal cannot use the increased value of Mr. Guenther’s legi-time to claim that the value of the entire active mass is also increased, thereby leading to an increase in her forced portion. To that extent, Mrs. Rosenthal’s reliance on Pratt is misplaced. Therefore, these assignments of error are without merit.

Sixth, Ninth, and Tenth Assignments of Error

In assignments of error six, nine, and ten, Mrs. Rosenthal challenges the reduction the trial court applied in this case. Specifically, she argues that the trial court erred by failing to reduce all legacies under the will, by failing to require Mr. *1168 Guenther to return the oil and gas royalties accruing on his legacy, and by finding that the forced portion be satisfied only from the residue of the estate.
In substance, the testament at issue contains the following provisions:
1. I give and bequeath the sum of $2,000.00 cash to my dear friend, JANICE RICH STURDEVANT.
2. I give and bequeath any royalties and/or mineral interests which I own at my death to my dear friend, LEO A. GUENTHER.
3. I give and bequeath to ELSA QUINTANILLA the framed mirror approximately 29 inches by 49 inches and cabinet below the mirror situated in my living/dining room, the 19" Zenith television, T.V. table, and rose designed glass vase on the T.V.
4. I give and bequeath to LENY BOU-DREAUX the two (2) Chinese figurines, male and female, bearing the inscription on bottom “EVERLAST CORP. GOLDSCHEIDER.”
h75. I specifically disinherit my daughter, JANE LINDER ROSENTHAL, since she has known how to contact me for quite some time, but has failed without just cause to communicate with me for a period of at least two (2) years prior to the date of this will. Should it be determined that this provision is invalid, then, and in that event, I desire that she receive only that portion reserved to her as provided under the laws of the State of Louisiana.
The balance of my estate, I give and bequeath to the Touro Synagogue, 1501 General Pershing Street, New Orleans, Louisiana.
After calculating the forced portion to be $10,467.72, the trial court denied Mrs. Ro-senthal’s request to reduce all of the particular legacies and determined that her forced portion could be satisfied from the balance of the estate. Mrs. Rosenthal challenges these decisions. Before determining whether reduction is required, we must first classify the legacies made in the testament.
A universal legacy is a testamentary disposition by which the testator gives to one or more the whole of the property he leaves at his decease. Succession of Moffat, 577 So.2d 1210,1212 (La.App. 4 Cir.1991), writ denied, 582 So.2d 1312 (La.1991); La. C.C. art. 1606.[6] A legacy under universal title is that by which a testator bequeaths a certain portion of the effects, as a half, a third or all of his immovables or movables or a fixed proportion of his immovables or movables. Id.; La. C.C. art. 1612.[7] Every legacy, however, not included in the definition of a universal legacy and a legacy under universal title is a particular legacy. Id.; La. C.C. art. 1625.[8] In this case, the testament includes particular legacies to Janice Rich Sturde-vant, Leo Guenther, Elsa Quintanilla, and Leny Boudreaux. It also includes a general/residual legacy to Touro Synagogue. The remaining question, |18then, is how must we treat the disposition to Mrs. Ro-senthal for only that portion reserved to her as provided under the laws of the State of Louisiana.
The enactment of La. C.C. art. 1495 in effect at the time of Mrs. Linder’s death *1169 considered all children forced heirs. Pratt, supra, at 312. And in Linder I, supra, this Court recognized Mrs. Rosen-thal as such. Therefore, Mrs. Rosenthal’s forced portion is one-fourth of her mother’s estate. Id. So, the seminal question is how should the forced portion be satisfied? The trial court determined that it should be paid from the balance of the funds available. Mrs. Rosenthal contends, on the other hand, that her forced portion must be satisfied from all legacies pursuant to La. C.C. art. 1511.
At the time of the decedent’s death, La. C.C. art. 1511 provided:
[w]hen the dispositions mortis causa exceed either the disposable quantum or the portion of that quantum that remains after the deduction of the value of the donations inter vivos, the reduction shall be made pro rata, without any distinction between universal dispositions and particular ones.
Succession of Trahant, 226 La. 653, 76 So.2d 919, 921 (1954).
Thus, pursuant to this article, universal or particular legatees are subject to a pro rata reduction only when dispositions mor-tis causa exceed the disposable portion or balance of the estate. In this case, the monetary dispositions made in the testament include a $2,000.00 cash bequest to Janice Sturdevant and the oil and gas royalties to Mr. Guenther, which we have determined have a date of death value of $2,949.00.
The enactment of La. C.C. art. 1502 in effect at the time of Mrs. Linder’s death provided, “any disposal of property, whether inter vivos or mortis causa, exceeding the quantum of which a person may legally dispose to the prejudice of the forced heirs, is not null, but only reducible to that quantum.” Succession of Trahant, 226 La. 653, 76 So.2d 919 (1954). In this case, the net estate is $41,870.00, the |13forced portion is $10,476.72, and the disposable portion is $31,403.14. As depicted, there is no impingement on Mrs. Rosenthal’s forced portion and no requirement that the particular legacies be reduced. Nevertheless, Mrs. Rosenthal contends that Touro Synagogue should not singularly bear the burden of satisfying her legitime. Rather, she contends that all legacies under the testament should be reduced.
Granted, the practical application of the trial court’s judgment will, in fact, “reduce” the bequest to Touro Synagogue. However, Touro Synagogue is, in fact, a residuary/universal legatee who is only entitled to the balance of the estate. “The residuary, or universal legatee, receives nothing, except what is left, after the payment of the debts and charges of the succession, the discharge of the particular legacies, and the contributions for the legi-time.” Succession of Peters, 192 La. 744, 189 So. 122, 123 (1939) (emphasis added). So, in essence, Touro Synagogue, does not necessarily bear the burden of satisfying the forced portion, because, by law, as a universal legatee, it is only entitled to what remains after the payments of debts and charges and the satisfaction of particular legatees and the legitime. Id.
Therefore, we find that the trial court did not err in failing to reduce the particular legacies or by finding that Mrs. Ro-senthal’s legitime be satisfied from the balance of the estate. Therefore, these assignments of error are without merit.

Eleventh Assignment of Error

Mrs. Rosenthal contends that the trial court erred in applying La. C.C. art. 1512 to find that the decedent expressed a preference that an undisclosed forced heir be paid from the balance of the estate. This assignment of error, however, is rendered moot in light of our holding above that Mrs. Rosenthal’s legitime can be satisfied from the balance of the estate.
*1170 | MSeventh and Eight Assignments of Error
Rosenthal argues that as a forced heir, her legitime should consist of an undivided one-fourth interest in her mother’s estate, and further asserts that her one-fourth legitime should be satisfied, in part, by rights to the mineral interests that Mrs. Linder bequeathed to Mr. Guenther, the particular legatee. Thus, she essentially construes “undivided interest” as the undivided asset rather than the undivided value of the asset.
At the time of Mrs. Linder’s death, La. C.C. art. 1493 provided, “[d]onations inter vivos or mortis causa cannot exceed three-fourths if the property of the disposer, if he leaves, at his decease, one child; and one-half, if he leaves two or more children.” In addition, La. C.C. art. 1505 provides:
A. To determine the reduction to which the donations, either inter vivos or mor-tis causa, are liable, an aggregate is formed of all the property belonging to the donor or the testator at the time of his death; to that is fictitiously added the property disposed of by donation inter vivos, according to its value at the time of the donor’s decease, in the state in which it was at the period of the donation.
B. The sums due by the estate are deducted from this aggregate amount and the disposable quantum is calculated on the balance, taking into consideration the number of forced heirs.
Mrs. Rosenthal claims that pursuant to La. C.C. art. 1493, La. C.C. art. 1505 requires the court to determine the aggregate assets, and to then give her an undivided one-fourth of those particular assets, rather than the value of the assets. Yet, academic and judicial interpretation of the calculation of forced portions as it relates to valuation of the estate does not support this argument. And there is nothing presented in Mrs. Rosenthal’s argument that the calculation of a legitime must consist of the assets themselves, rather than the value of the assets.
Li The forced portion is part of the decedent’s overall estate.[9] The estate is taken as a whole in order to ascertain the value that a forced heir is entitled to — this does not mean that every asset in the estate is itself subject to the forced heir’s legitime. Rather, the value of all assets should be considered so that the forced portion can be calculated. La. C.C. art. 1505 supports this conclusion. Specifically, the language of subsection (B) states that the disposable quantum that is calculated, after consideration of any forced heirs, uses the “aggregate amount ” as the bases for the calculation, rather than the aggregate assets. La. C.C. art. 1505. Thus, Mrs. Rosenthal’s contention that she is entitled to one-fourth of Mr. Guenther’s particular legacy, even though her portion may be satisfied from the residuary is without merit.
The Louisiana Supreme Court explained in Succession of Coste, 9 So. 62 (La.1890) that particular legatees are never liable to contribute to the payment of debts or to satisfy the legitime portion of the forced heir when there are other assets out of which said charges can be satisfied. There can be no residuum for residuary legatees or legal heirs until the particular legacies are fully acquitted. Id. Since Mrs. Ro-senthal’s forced portion can be satisfied without disturbing the particular legatee’s bequeathal, namely Mr. Guenther’s mineral interests, there is no bases to disturb his bequest. Therefore, Mrs. Rosenthal’s contention that she is entitled to one-fourth of the oil and gas interests is without merit. And because we have already determined *1171 that her legitime does not consist of Mr. Guenther’s particular legacy, we further find that she is not entitled to any past or future royalties produced from his specific bequest.

1twelfth Assignment of Error

Next, Mrs. Rosenthal contends that the trial court erred by failing to award her interest from the day she opposed the disinherison and demanded her legitime.
In Succession of Dittmar, 493 So.2d 221, 224 we held:
[B]ecause legal interest was not demanded in Clifford Quinn’s ‘Rule to Show Cause,’ Clifford cannot on appeal raise this issue for the first time and receive legal interest on his portion of his father’s succession. Louisiana Code of Civil Procedure article 1921. Louisiana Code of Civil Procedure article 1921 provides:
The court shall award interest in the judgment as prayed for or as provided by law. (emphasis in original)
Likewise, in this case, Mrs. Rosenthal’s opposition to the homologation does not include a request for interest, and she cannot raise this issue for the first time on appeal. This assignment of error is without merit.

Thirteenth and Fourteenth Assignments of Error

Finally, Mrs. Rosenthal contends that Mr. Guenther breached his fiduciary duty by not knowing what his fiduciary duty entailed, by placing his interest as a legatee above hers, and by failing to return over $600,000 in mineral royalties once this Court vacated the judgment of possession in Linder TV, supra.
Mr. Guenther testified that the June 13, 2005 descriptive list initially valued the oil and gas interests on the date of death at $2,200.00. He explained, however, that the oil and gas interests were not formally appraised. Instead, he relied on an informal, unwritten opinion of one of his clients, Mr. Richard Price, a geologist, whose family owned oil companies. Mr. Guenther explained that he did not have the Succession’s oil and gas interests formally appraised because Mr. Price indicated that it would be costly to do so — although Mr. Price did not specify how^great the expense would be. Nevertheless, Mr. Guen-ther testified that the other estate properties were formally appraised.[10]
Mr. Guenther testified that once the trial court rendered the judgment of possession on June 18, 2007, his attorney advised him to close out the succession account and take possession of the funds. He then transferred approximately $600,000 of those funds to himself. He explained that he retained those funds after this Court vacated the judgment of possession in Lin-der, TV, explaining that his counsel instructed him to retain the money because the Succession owed him “a lot more money than that.”
During cross-examination, Mrs. Rosen-thal’s counsel brought Mr. Guenther’s attention to the tableau of distribution that was filed into the record. The tableau depicts receipts of oil and gas royalties from December 1, 1994 through October 31, 2004. The Succession’s bank records, however, reflect that the estate received at least $80,000.00 more in additional royalties in 2005 and 2006. Mr. Guenther, however, could not explain why the deposits were not reflected on the tableau.
*1172 The trial court ultimately found that Mr. Guenther had not breached his fiduciary duty. However, in its reasons for judgment it stated, “... this Court does recognize evidence indicating that Mr. Guenther failed to update the Final Tableau to note additional royalties received after October 2004, including those funds held in the registry of the court in Point Coupee Parish” and “Mr. Guenther must return all royalties he received as a result of the vacated Judgment of Possession to the succession accounts until the final Judgment of Possession is entered.... ”
A succession representative serves in a fiduciary capacity. Succession of Mangle, 452 So.2d 197, 200 (La.App. 3 Cir.1984); La. C.C.P. art. 3191. (citations omitted). He owes a duty to legatees, creditors, and heirs and may not place their own ^interest before the succession interest. Id. The Third Circuit further elaborated on the succession representative’s fiduciary duty in Succession of Songne, supra, at 559 as follows:
[A] succession representative is a fiduciary of the succession and has the duty of collecting, preserving, and managing the property of the succession in accordance with law. La.Code Civ.P. art. 3191. She must act, at all times, as a prudent administrator, and she is personally responsible for all damages resulting from her failure to so act. Id. This fiduciary duty should be read expansively to pervade all of the representative’s operations. La.Code Civ.P. art. 3191, comment (a). The court may remove a succession representative who has mismanaged the estate or who has failed to perform any duty imposed by law. La.Code Civ.P. art. 3182.
Among the specific duties of the succession representative is the duty to collect all succession funds and deposit them in a succession bank account as soon as they are received. La.Code Civ.P. art. 3222. The representative may be dismissed from office for failure to comply with this duty. Id. It is no defense under this article that the representative honestly believes that she has a claim to the funds not deposited as required; she must first deposit succession funds in a succession account, and only then may she properly assert her claim thereto. Succession of Dykes, 258 So.2d 606 (La.App. 1 Cir.), writs denied, 261 La. 533, 260 So.2d 319, 320 (1972).
Fiduciaries owe the highest standard of care to collect, preserve, and manage an estate’s property. And as the court in Songne stated, they also owe a duty to the legatees. Although there is no prohibition against a legatee serving as an estate’s executor, this dual role often times presents a conflict of interest — as it does here. We note, however, that a mere conflict of interest in itself does not warrant removal. It is “when this conflict becomes such that it is actively tainting the administration of the succession, [that] removal of the executor becomes necessary.” Mangle, supra, at 200.
We first note that, contrary to Mrs. Rosenthal’s assertion, Mr. Guenther does know what his fiduciary duty entails. He testified that as executor, he was responsible for collecting, maintaining, and protecting the Succession’s assets. Mrs. Ro-senthal maintains, however, that Mr. Guenther breached his fiduciary duty [ ¾⅛/-deciding to pay her legitime in cash rather than with a percentage of the royalties. Yet, we have already determined that Mrs. Rosenthal is not entitled to Mr. Guenther’s legacy or any fruits thereof; therefore, there was no breach in this regard. Although this Court is especially *1173 concerned with Mr. Guenther’s failure to return the oil and gas royalties once we vacated the judgment of possession, we do not find that this amounts to a breach of his fiduciary duty. Compare, Mangle, supra, (the executor failed to notify forced heirs concerning their entitlement to the forced portion); Langendorf v. Admin. Of Tulane Ed. Fund, 361 So.2d 905 (La.App. 4 Cir.1978) (executor devised a scheme to purchase estate property, that belonged to heirs, for himself).
The record supports the conclusion that Mr. Guenther has served as a prudent administrator of the Succession — he has collected, preserved and managed the estate’s assets. Although Mr. Guenther failed to update the final tableau with the royalty payments received after 2004, the Succession’s bank records reflect that the royalty checks were, in fact, deposited into the bank account. There is no evidence that Mr. Guenther’s actions have actively tainted the administration of the succession. We, therefore, find that the trial court did not err in finding that Mr. Guen-ther did not breach his fiduciary duty.

Assignments of Error Fifteen, Sixteen, and Seventeen

Mrs. Rosenthal argues alternatively that all legacies in the testament lapsed due to the estate’s insolvency. She contends that the estate would have been insolvent if the trial court had not allowed Mr. Guenther to pay certain expenses related to the Succession. We are unable, however, to find any authority which prohibits a legatee from electing to pay expenses from his/her legacy. Therefore, we find no basis to disturb the trial court’s judgment which found the estate to be solvent on the date of death.
12f,Based on the foregoing, the trial court judgment is affirmed. Mr. Guenther is ordered to return the money he removed from the Succession account until a valid judgment of possession is rendered. He is further ordered to update the final tableau of distribution to reflect all funds the Succession has received.

AFFIRMED; REMAND FOR PROCEEDINGS CONSISTENT WITH THIS OPINION

EDWARDS, C.J., dissents.

. "The price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction.” Black’s Law Dictionary 1549 (7th ed.1999).

. Kathryn V. Lorio, Louisiana Civil Law Treatise: Successions and Donations § 10:7 (2d ed.2009).

. The Louisiana Supreme Court further crystallized the point in Wilkins v. Nelson, 155 La. 807, 813-814, 99 So. 607 (La.1924), when it stated, "[t]he price [of oil and gas] may be at the very lowest today and by ‘leaps and bounds' reach the very peak of prices tomorrow, dependent on the production or nonpro-duction of oil and gas in the neighboring territory” (emphasis added). See also Cascio v. Twin Cities Dev., LLC., 45,634, p. 5 (La.App. 2 Cir. 9/22/10), 48 So.3d 341.

. Original Brief of Appellant at 13, Succession of Linder, No. 11-0633 (7/8/11).

. The active mass includes the aggregate of all property belonging to the testator at the time of his death, including inter vivos donations made within three years of the date of death. See La. C.C. art. 1505.

. La. C.C. art. 1606 was revised by Acts 1997, No. 1421 § 1 and is currently restated in La. C.C. art. 1585.

. La. C.C. art. 1612 was revised by Acts 1997, No. 1421 § 1 and is currently restated in La. C.C. art. 1586. It is now referred to as a "general legacy.”

.La. C.C. art. 1625 was revised by Acts 1997, No. 1421 § 1 and is currently restated in La. C.C. art. 1587.

. Edward E. Chase, Jr. Louisiana Civil Law Treatise: Trusts, § 11:1 (2d ed.2009).

. Mr. Guenther testified that estate's jewelry, movables, and immovable were formally appraised.