HIGGINBOTHAM, J.'
In this succession proceeding, appellant, Dorothy Reno (Mrs. Reno), the surviving spouse of the decedent, Vic Reno (Mr. Reno), appeals four judgménts by the district court, each dated March 2, 2015. The judgments ordered the homologation of the ninth, tenth, eleventh, and twelfth tab-leaus of distribution submitted by the administrator of the succession, Mr. Reno’s son, appellee,' James B. Reno (Jimmy), authorizing him to pay the debts and charges submitted as succession debts, from the succession’s bank account.
FACTUAL AND PROCEDURAL HISTORY
On November 25, 2012, Mr. Reno died. Two months following the death of Mr. Reno, Jimmy' petitioned ‘ the court to be appointed as provisional administrator of the estate. His petition was granted by the district court on February 6, 2013. Thereafter, Jimmy filed a petition for appointment as full administrator and was appointed full administrator by order of the court on March 5, 2013.[1]
In conjunction with those proceedings, Jimmy claimed the existence of a last will and testament executed by Mr. Reno, dated December 7, 2007, in which he was a named legatee (hereafter referred to as the 2007 will). He further alleged that he anticipated members of the Reno family would challenge another will signed by Mr. Reno in 2011, on the grounds of incapacity of Mr. Reno and undue influence on the part of Mr. Reno’s grandson, Joshua K. Fontenot (Joshua). Following Jimmy’s appointment as administrator, and this court’s June 2015 opinion affirming that appointment, Jimmy proceeded to administer the estate.
Representing that he was acting in his capacity as administrator of the succession, Jimmy filed a petition to annul 2009 inter vivos property transfers made to Joshua through a trust in which Mr. Reno and Mrs. Reno were co-trustees (hereafter referred to as the 2009 inter vivos donations). In his petition, Jimmy alleged that the purported sales were disguised donations, and that at the time of the transfers, Mr. Reno’s mental capacity had declined, making him vulnerable to manipulation by Joshua.
On July 8, 2013, Mrs. Reno filed a petition to probate Mr. Reno’s purported last will, executed on July 7, 2011 (hereafter referred to as the 2011 will). The 2011 will granted the naked ownership of Mr. Reno’s entire estate to his grandson, Joshua, and a usufruct of that estate to Mrs. Reno. In the 2011 will, Mr. Reno revoked all prior wills and named the expenses that should be paid as administrative expenses of his succession, including legal fees and court costs associated with administering or defending the 2011 will. The 2011 will did not name an executor.
On October 30, 2013, Jimmy filed a petition to probate the 2007 will. Joshua opposed probate of the 2007 will and requested that the 2011 will be probated. In the alternative, Joshua requested that a third *1151 will signed on March 13, 2008 (hereafter referred to as the 2008 will), be probated if the 2011 will was found invalid.[2] At this juncture, none of the wills have been probated.
During the pendency of these proceedings, in his capacity as administrator, Jimmy filed eight petitions seeking 'authority to pay succession debts and expenses, and tableaus of distribution for homologation, all eight of which were granted and not appealed. At issue in this appeal are the subsequently filed petitions and tableaus of distribution that were opposed: the ninth, filed on June 3, 2014; the tenth, filed on July 31, 2014; the eleventh, filed on October 10, 2014, and the twelfth, filed on December 30, 2014. Altogether, in the ninth, tenth, eleventh, and twelfth petitions Jimmy sought authority to pay $96,871.36 in expenses and charges, which included $57,926.51 in attorney fees, $29,587.50 in medical, expert witness fees, $7,885.00 in-fees for accounting and business valuation, $1,419.72 for the administrative bond premium, and $52.63 for a property tax.
Mrs. Reno opposed the four petitions and tableaus of distribution, because she contended that Jimmy has used and continues to use estate assets to fund his challenge to the 2011 will, when the administrator’s duty is to preserve and protect the estate. Mrs. Reno also maintained that much of the funds Jimmy seeks reimbursement for are for the benefit of him personally rather than for the benefit of the estate.[3]
A hearing on the four petitions was held on February 23, 2015, during which counsel for Jimmy, Mr. William C. Shockey (Mr. Shockey), testified concerning the legal services rendered to Jimmy as administrator of the estate. Additionally, Mr. Shockey testified regarding the other expenses and charges Jimmy sought authority to pay as succession debts. Mr. Shockey discussed a breakdown of services that he had provided for Jimmy, including services for: 1) general administration; 2) identification and collection of assets; 3) legal action to recover assets that were donated inter vivos; 4) legal action to oppose the probate of the 2011 will; 5) legal action for accounting against Joshua pursuant to a power of attorney; and 6) defending all efforts made in the past to remove Jimmy as administrator.
Mr. Shockey testified that the medical expert fees Jimmy sought authority to pay were incurred .by hiring Dr. Herbert W. LeBourgeois, who performed a psychological autopsy in order to challenge the capacity of Mr. Reno in 2011, when he executed the 2011 will, and in 2009 when he made the 2009 inter vivos donations to Joshua. Mr. Shockey also testified that Jimmy hired accountants to perform business valuation services, to determine Mr. Reno’s interest in a business, and to review Mr. Reno’s tax returns.
After the hearing, on March 2, 2015, the district court rendered four separate judgments homologating the ninth, tenth, eleventh, and twelfth tableaus of distribution and authorizing Jimmy to pay the debts and charges listed therein from the succession account. This appeal by Mrs. Reno followed. She sets forth two assignments of error:
*1152 1. A detailed descriptive list allows the court to determine whether the estate has sufficient funds to pay debts and charges. Because the administrator James B. Reno [Jimmy] has failed to file a detailed descriptive list, the trial court committed manifest error in approving the ninth, tenth, eleventh, and twelfth tableaus of homologation based solely on the assertion that the estate has “cash on hand” to satisfy current debts.
2. Although an administrator can expend estate funds to preserve and protect succession property, including the defense of the testament, the administrator cannot use succession funds to benefit himself or, take action adverse to the interest of the estate. Because [Jimmy] has used, and continues to use estate funds to challenge the testator’s capacity to execute the testament he is appointed to protect, the ' trial court committed manifest error in approving the payment of his incurred attorney fees.
ASSIGNMENT OF ERROR # 1 DETAILED DESCRIPTIVE LIST
Mrs. Reno argues that Jimmy’s failure to file a detailed descriptive list prevents the court from knowing whether the estate is solvent or able to sustain the extent of attorney fees and expenses incurred. According to the Louisiana Code of Civil Procedure, a detailed descriptive list indexes all succession property while a tableau, of distribution lists succession debts. See La. Code Civ. P. arts. 3136 and 3303; Succession of Moore, 96-1268 (La. App. 1 Cir. 6/20/97), 696 So.2d 1040, 1042.
The filing of a detailed descriptive list in lieu of an estate inventory is authorized by Article 3136, which provides:
Whenever an inventory of succession property otherwise would be required by law, the person at whose instance the inventory would be taken may file with the Department of Revenue and in the succession proceeding, in lieu of an inventory complying with articles 3131 through 3135, a detailed, descriptive list of all succession property. This list shall be sworn to and subscribed by the person filing it, shall show the location of all items of succession property, and shall set forth the fair market value of each item thereof at the date of the death of the deceased.
The privilege of filing a descriptive list of succession property, in lieu of an inventory thereof, may be exercised without judicial authority.
The descriptive list of succession property authorized by Article 3136 shall be accepted as prima facie proof of all matters shown therein, unless amended or traversed successfully. La. Code Civ. P. art. 3137. The purpose of the detailed descriptive list is to provide a complete, concise evaluation of the property of the deceased thereby enabling the succession representative to properly administer the succession and informing heirs, creditors, and other interested parties to the nature and value of the succession of property. Succession of Willis v. Martin, 228 So.2d 732, 734 (La.App. 3d Cir.1969), writ refused, 255 La. 244, 230 So.2d 93 (1970).
Mrs. Reno argues that since Jimmy did not file any detailed descriptive list prior to the judgments authorizing the payment of debts listed in the four tableaus of distribution, the judgments were granted even though neither “the court nor the parties have a clue about the solvency of the estate.” Moreover, she asserts that without a detailed descriptive list, the payment of those tableaus of distribution “could place the entire estate in financial jeopardy,”- and therefore, the district court manifestly erred in granting those petitions.
*1153 The record reveals that Jimmy filed, and was granted, six separate motions seeking extensions of time in which to file a detailed descriptive list. In those motions, Jimmy represented that he had undertaken “substantial activities” to identify and take possession of succession assets, but that his efforts had been continually thwarted by Mrs. Reno and Joshua. Jimmy represented that any detailed descriptive list filed with the court in the absence of an extension of time would be “incomplete and nowhere near representative of the assets” of the succession. On the basis of these representations, the district court granted Jimmy’s motions for extension of time, without objection by any other party.
Jimmy maintains that there was evidence that the succession had ample “cash on hand” to pay the debts listed in the tableaus at issue, and thus, the district court did not err in granting his petitions and authorizing the payment of those debts. Additionally, Jimmy argues that even if the filing of a detailed descriptive list was a prerequisite to a judgment ho-mologating the tableaus of distribution, the absence of a descriptive list in this matter is harmless error in light of the ample proof before the district court that the succession had sufficient funds on hand to pay the listed debts.
In rendering the judgments at issue, the district court, in oral reasons fdr judgment, alluded to knowledge it had from prior hearings and the transcripts thereof. The district court expressed concern that a detailed descriptive list had not yet been filed, and expressly suggested to Jimmy that he file one. The district court also noted that to the extent that future assets might be found to belong in the estate, the descriptive list could be amended. Notwithstanding its concerns regarding the absence of a detailed descriptive list, the district court approved the tableaus of distribution and authorized the payment of the debts listed therein.
Although one of the first duties of an administrator to a succession is to file an inventory or detailed descriptive list, there is no statutory time limit for the filing and no statutory requirement that such be filed prior to homologating tab-leaus of distribution. The district court did not abuse its discretion in considering the propriety of those petitions seeking • authority to pay debts of the succession in the absence of a filed detailed descriptive list. The first assignment of error has no merit.
ASSIGNMENT OF ERROR # 2 AUTHORITY TO PAY SUCCESSION DEBTS
Mrs. Reno asserts, that the petitions seeking authority to pay succession debts and expenses should not have been granted in Jimmy’s favor, arguing that the attorney fees and expenditure of estate funds were not incurred to preserve, protect, and manage estate property, but rather, for Jimmy’s own personal benefit. Specifically, she asserts those fees were incurred by Jimmy in the pursuit of his challenge to the testator’s capacity to execute the testament “he is appointed to protect,” as well as his challenge to certain inter vivos donations of property made by Mr. Reno to.Joshua prior to his death. Additionally, Mrs. Reno noted that the estate is being greatly diminished by Jimmy’s actions, and at this juncture more than $300,000.00 of the estate’s money has been spent by the administrator, including more than $217,000.00 in attorney fees.
Under La. Code Civ. P. art. 3301, a succession representative may pay .an estate debt only with the authorization of the court.[4] The procedure for the payment of *1154 estate debts is provided in La. Code Civ. P. art. 3303, as follows:
A. When a succession representative desires to pay estate debts, he shall file a petition for authority and shall include in or annex to the petition a tableau of distribution listing those estate debts to be paid. A court order shall not be required for the publication of the notice of filing of a tableau of distribution.
B. If the funds in his hands are insufficient to pay all the estate debts in full, the tableau of distribution shall show the total funds available and shall list the proposed payments according to the rank of the privileges and mortgages of the creditors.
Estate or succession debts are defined in La. Civ. Code art. 1415 as:
[D]ebts of the decedent and administration expenses. Debts of the decedent are obligations of the decedent or those that arise as a result of his death, such as the cost of his funeral and burial. Administration expenses are obligations incurred in the collection, preservation, management, and distribution of the estate of the decedent. (Emphasis added.)
Administration expenses are broadly defined to include expenses that are incurred after death in preserving, safeguarding, and operating the property of the estate, such as repairs, costs of maintenance and upkeep, interest attributable to a debt, and custodial fees. See Article 1415, Revision Comments-1997.
Louisiana jurisprudence establishes there are instances when attorney fees incurred by the succession representative may be classified as estate debts. See e.g., Succession of Daste, 254 La. 403, 423, 223 So.2d 848, 855 (1969) (approving the expenditure of $19,300.00 in attorney fees for work performed by attorneys for the executor and in “winding up” the succession as estate debts); see also Succession of Cole, 2012-802 (La.App. 3 Cir. 12/26/12), 108 So.3d 240, 254-55, writ denied, 2013-0257 (La. 3/15/13), 109 So.3d 384 (where the court noted the unappealed portion of a district court judgment authorizing one half of the submitted legal fees to be paid as an estate debt, but rejecting the authorization of payment of the other half of the legal fees, which it found were incurred for the personal benefit of the executor when he defended, as co-heir, the challenge to a prior consent judgment that constituted the apportionment of inherited stock). Additionally, legal expenses of administration incurred by an executor on behalf of the estate, and expenses incurred in defense of the will when under attack, are proper charges against the succession. Succession of Bradford, 130 So.2d 702, 706 (La.App. 2d Cir.1961).
However, while the estate may be liable for attorney fees incurred by the administrator for services performed for the benefit of the estate, the estate is not liable for attorney fees for services that benefit the administrator individually. See Succession of Menendez, 160 So.2d 827, 829 (La.App. 4th Cir.1964). Attorney fees paid prior to the final determination of a will contest should be solely limited to those incurred in connection with the preservation and protection of the succession property. Succession of Kilpatrick, 422 So.2d 483, 492 (La.App. 2d Cir.1982), writ denied, 429 So.2d 126 (La.1983).
The executor (administrator or succession representative) of a succession is the majordomo of the estate, having possession of all its property as well as the power and responsibility to preserve its assets and enforce its claims. Horell v. Horell, 99-1093 (La.App. 1 Cir. 10/6/00), 808 So.2d 363, 370, writ denied, 2001-2546 *1155 (La. 12/7/01), 803 So.2d 971. A succession representative is a fiduciary with respect to the succession and has the duty to collect, preserve, and manage the property of the succession. See La. Code Civ. P. arts. 3191 and 3221. His duties include closing the succession as soon as advisable. La. Code Civ. P. art. 3197(A). However, a succession representative has no duty to challenge the validity of the last will and testament of the decedent. He owes a duty to legatees, creditors, and heirs and may not place his own interest before the succession interest. In re Succession of Lin-der, 2011-633 (LaApp. 5th Cir. 5/22/12), 92 So.3d 1158, 1172, writ denied, 2012-1893 (La. 12/14/12), 104 So.3d 440.
Under Louisiana law, there is a presumption in favor of the validity of testaments. In re Succession of Holbrook, 2013-1181 (La. 1/28/14), 144 So.3d 845, 853. Similarly, testamentary capacity is always presumed, until the contrary is affirmatively established by satisfactory and convincing evidence. In re Succession of Theriot, 2008-1233 (La.App. 1 Cir. 12/23/08), 4 So.3d 878, 882. It is well-established that the succession representative has a duty to defend the validity of the testator’s last will and testament. Thus, the costs incurred in a proceeding defending a last will and testament are generally assessed to the succession. Atkins v. Roberts, 561 So.2d 837, 841 (La.App. 2d Cir. 1990) (citing Succession of Kite, 366 So.2d 602, 604 (La.App. 3d Cir.1978), writ denied, 369 So.2d 155 (La.1979)); see also In re Succession of Bernat, 2011-368 (La. App. 3 Cir. 11/2/11), 76 So.3d 1287, 1292, writ denied, 2012-0263 (La. 3/30/12), 85 So.3d 122. However, there is jurisprudence that indicates costs may be allocated to a succession representative individually, when that representative has a significant personal interest in the outcome of the will contest. See Atkins, 561 So.2d at 841.
In this matter, Jimmy, as the administrator, has incurred substantial fees and expenses attacking, rather than defending, the validity of the 2011 will that is legally presumed to reflect Mr. Reno’s last wishes for the transmission of his estate. Those fees and expenses are significantly depleting the succession assets, which the administrator is duty bound to preserve, mam-age, and distribute to the legatees as soon as possible. In the present matter, the last four tableaus of distribution include $57,926.51 in attorney fees, and $29,587.50 in medical expert fees that, at least in part, were incurred by Jimmy in an effort to invalidate the 2011 will, which is presumed valid, rather than to defend it. Additionally, Jimmy expended succession funds to invalidate inter vivos donations made by Mr. Reno to Joshua, who was granted naked ownership of Mr. Reno’s entire estate in the 2011 will.
As the matter stands now, none of the wills filed with the district court have been probated, and the validity of the 2011 -will has not been determined. As administrator of the estate, Jimmy is not to assume the judicial role of determining which will is valid; his role is to produce the will for probate, leaving to any interested party the onus of impeaching its validity. On the current path, if the Jimmy is unsuccessful in challenging the 2011 will, substantial assets of the estate will have been spent on a fruitless pursuit. In that event, under either the 2009 donations (if upheld) or the 2011 will (if the donations are rescinded), Joshua will ultimately receive the assets, except that the estate will have been depleted by the amount of expenses incurred by Jimmy.
There was no proof offered by Jimmy to show that fees expended by him to challenge the 2011 will and the 2009 inter vivos donations were for the benefit of the estate; rather, the evidence reveals that *1156 the fees were incurred for the benefit of Jimmy individually. See In re Succession of Sporl, 2004-1373 (La.App, 4th Cir. 4/6/05) 900 So.2d 1054,1063. Jimmy sought probate of the 2007 will in which he was a named legatee, and he has sought authority to use succession assets to invalidate the 2011 will in which he was not a named legatee.[5] For that reason, we find the funds expended to challenge the 2011 will and to annul the 2009 inter vivos donations were not used to preserve, protect, and manage estate property, but rather for Jimmy’s own personal benefit. Because the estate is not liable for services rendered to the administrator individually, the district court erred in granting authority to Jimmy to pay for those services from the succession’s account funds in order to challenge the 2011 will and the 2009 inter vivos donations.
For the foregoing reasons, we reverse the portions of the March 2, 2015 judgments of the district court that ordered the homologation of the ninth, tenth, eleventh, and twelfth tableaus of distribution authorizing use of succession funds to pay for expenses that were not incurred for the benefit of the estate.
Specifically, according to the testimony of Mr. Shockey, Dr. LeBourgéois was hired to perform a psychological medical autopsy of Mr. Reno in' order to challenge the capacity of Mr. Reno when he made the 2009 inter vivos donations and executed the 2011 will. Because all of the medical expert witness fees Jimmy sought authority to pay were used to challenge Mr. Reno’s capacity at the time he made the 2009 inter vivos donations and the 2011. will, we reverse the portion of the judgments homologating the ninth, tenth, eleventh, and twelfth tableaus of distribution authorizing payment of expert witness fees owed to Dr. LeBourgeois.[6]
Under the facts of this case, the court questions some of the fees sought for accounting services allegedly for the estate. However, we cannot say it was reversible error for the district court to approve such expenses for the preservation, management, and protection of the succession property. Therefore, we affirm the portion of the judgment homologating the eleventh tableau of distribution that authorized payment for “Accounting Services” totaling $1,885.00 and the portion of the judgment homologating the twelfth tableau of distribution authorizing payment for “Accounting Services” totaling $600.00, “Property taxes and bond premium” totaling $1,472.35, and “Business valuation service” totaling $5,400.00.
Mr. Shockey presented detailed documents regarding his fees; but in reviewing the documents, it was impossible to clearly determine what fees, if any, were incurred solely for the preservation, management, and protection of the succession property, what fees have already been paid,- or what fees were incurred for Jimmy’s personal benefit. Therefore, we reverse the portion of the judgments homolo- *1157 gating the ninth, tenth, eleventh, and twelfth tableaus of distribution, authorizing payment of attorney fees.[7]
CONCLUSION
For the foregoing reasons, the separate judgments signed March 2, 2015, homolo-gating the ninth, tenth, eleventh, and twelfth tableaus of distribution and authorizing Jimmy to pay the debts and charges listed therein from the succession account are 'reversed insofar as the judgments authorized payment of attorney fees and fees to Dr. LeBourgeois. The judgments homol-ogating the eleventh and twelfth tableaus of distribution are affirmed in part insofar as the judgments authorized payment of accounting services, property taxes, a bond premium, and business valuation services. This matter is remanded to the district court for further proceedings. The costs of the appeal are assessed to Mr. James B. Reno.
REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.
. Pettigrew, J. concurs in part; Dissents in part, and assigns Reasons
Welch, J: concurs' in part; Dissents in part for Reasons assigned by Judge Pettigrew
Crain, J. concurs in part; dissents in part for reasons assigned.

. Joshua Fontenot, Mr. Reno’s grandson, filed a “Petition to Vacate and/or Anul (sic) Judgment,” alleging that Jimmy, in seeking his appointment as administrator, had committed acts of “fraud and ill practice,” as contemplated by La. Code Civ. P. art. 2004. On that basis, Joshua sought to vacate or annul the orders of February 6, 2013 and March 5, 2013 appointing Jimmy as administrator of the succession. The district court refused and Joshua appealed. In In re Succession of Reno, 2013-1823 (La.App. 1 Cir. 6/17/15), 175 So.3d 412, 418, this court affirmed the district court’s judgment, leaving intact the appointment of Jimmy as administrator.

. Jimmy was not a legatee in the 2008 will, and the will stated that the reason for omitting Jimmy and his children was because Mr. Reno had previously donated stock in R Square Investment, L.L.C. to Jimmy, which Mr. Reno felt was of equal value to his anticipated estate.

. The record reveals that Joshua opposed the ninth petition, and Mrs. Reno filed oppositions to the tenth, eleventh, and twelfth petitions, including in her memorandum arguments in opposition to the ninth petition as well.

. That article further provides, "except as provided by Articles 3224 and 3302.” Those *1154 exceptions are inapplicable herein.

. Jimmy is also not a named legatee in the 2008 will, but it is the 2007 will that Jimmy petitioned the district court to probate, knowing that two later wills exist. We conclude that at this juncture in the case, where the 2011 will is presumed valid and the 2009 inter vivos donations were made to Joshua, who was granted naked ownership of Mr. Reno's entire estate in the 2011 will, there is no evidence to prove that the extensive funds used to challenge the 2011 will and 2009 inter vivos donations were incurred for the benefit of the estate.

. This includes the $12,612.50 in expert witness fees in the judgment homologating the ninth tableau of distribution, $6,387.50 in the judgment homologating the tenth tableau of distribution, $4,112.50 in the judgment ho-mologating the eleventh tableau of distribution, and $6,475.00 in the judgment homolo-gating the twelfth tableau of distribution.

. This includes the $11,687.41 in legal fees and expenses in the judgment homologating the ninth tableau of distribution, $6,190.16 in the judgment homologating the tenth tableau of distribution, $29,677.17 in the judgment homologating the eleventh tableau of distribution, and $10,371.77 in the judgment homolo-gating the twelfth tableau of distribution.