CRAIN, J.
*750 This litigation arises out of a will dispute. After a trial on the merits, the trial court found the testator had testamentary capacity; however, finding undue influence, the trial court invalidated certain bequests in the will. The legatees of the voided bequests appeal the judgment and also seek review of two interlocutory rulings, namely, the denial of both an exception of no right of action and a motion to remove the independent executrix. After en banc consideration, we affirm the judgment on the merits, affirm the denial of the motion to remove the independent executrix, and reverse the denial of the exception of no right of action.
FACTS AND PROCEDURAL HISTORY
Nettie Dean died on August 26, 2010, at the age of 62. She was survived by two sisters, Cherry Dean and Lenda Dean Perez; one brother, Douglas Dean; her parents, Lynn Dean and Jacquelyn Dean; and several nieces and nephews. The bulk of her estate consists of units of ownership in Elevating Boats, L.L.C. (EBI), a predominantly family-owned business started by her father where Nettie worked for many years as the chief financial officer and secretary. The disposition of Nettie's units of ownership in EBI is the crux of the dispute in this litigation.
Ownership of the company is divided into two classes of units: "Class A" units, which carry all voting power, and "Class B" units, which have no voting power. Ten thousand Class A units were created, all of which were donated to Nettie by her parents in 2006. Nettie also owned over 25,000 Class B units, representing slightly more than six percent of the total Class B units. On February 1, 2007, without the knowledge of her family, Nettie donated 1,000 Class A units to Ken Serigne, the chief executive officer of EBI, and 1,000 Class A units to Walter Cure, the company's vice-president. Her remaining 8,000 Class A units, as well as all of her Class B units, were still owned by Nettie at the time of her death.
Nettie executed three wills. The first, an olographic will, was signed on March 7, 2007, and bequeathed her Class A units as follows: 2,000 units to each of three nephews, Troy Dean, Luke Dean, and Cy Dean, and 1,000 units each to Serigne and Cure. Her Class B units are not mentioned in that will. Other beneficiaries and their respective legacies include a friend, Janet Kaleher ($50,000), a nature conservancy (land in Arkansas), her sisters Cherry and Lenda (sterling silver), her brother Douglas (a vehicle, a storage trailer, and an RV travel trailer), and a small cash legacy to the caretaker of her pets.
*751 The second will, also in olographic form, was executed on March 29, 2010, and bequeathed all of Nettie's Class A units to her nephew Troy. Her Class B units were left to EBI to be administered by Serigne and Cure to reward EBI employees, except for a small number left to Troy's son, Jax Dean. This will also bequeathed her house and vehicle to Cherry, and a truck to EBI. Other than those changes, the remaining bequests were the same as the 2007 will.
The last will Nettie executed is in notarial form and was signed by her on August 20, 2010, a few days before her death. Terminally ill from cancer and confined to a mattress on the floor, Nettie signed the will while several legatees named in the will stood nearby and observed, including Serigne and Cure. In this will, Nettie bequeathed her remaining 8,000 Class A units to Serigne, Cure, Luke, Troy, and Cy, to be divided equally. Those same individuals were bequeathed Nettie's Class B units, except for separate bequests of 840 units, each, to Serigne's daughter, Kristina Henderson, and to Troy's son, Jax. Most of the remaining bequests are similar to the prior wills, except Nettie's house and a travel trailer were left to Alicia and Shawn Nettles (Douglas' daughter and son-in-law), and the funds in a certain brokerage account were to be placed in trust for Alicia and Shawn's children.[2] Nettie died six days later.
Lenda filed a petition seeking to probate the March 29, 2010 will (March will) and challenging the validity of the August 20, 2010 will (August will), alleging Nettie did not have testamentary capacity when she signed the August will. Lenda further alleged that Cure, in violation of a relationship of trust, exerted undue influence on Nettie and caused her to sign the August will, which, when coupled with the previously undisclosed donations, resulted in Cure and Serigne acquiring a majority of the Class A units in EBI. Cherry, who was named executrix in both the March will and the August will, intervened in the proceeding and filed the originals of both wills with the court; however, she did not vouch for the authenticity of the August will and reserved her right to contest its validity. Per her request, Cherry was appointed independent executrix of Nettie's estate. Cherry later amended her petition of intervention to allege the August will was invalid due to Nettie's lack of testamentary capacity and was the subject of undue influence by Cure and Serigne. In the same proceeding, Cure, Serigne, and Henderson filed a petition to probate the August will. After all issues were joined, the competing claims proceeded to a five-day bench trial.
The evidence at trial established that Nettie was extremely ill in the final weeks of her life. Diagnosed with cancer that metastasized to her brain, Nettie underwent brain surgery on April 7, 2010, followed by unsuccessful radiation. A CT scan on August 13, 2010, showed significant progression of the cancer and swelling of her brain. She was discharged home on August 17, 2010, under hospice care.
Nettie's primary caretaker throughout her illness was her sister Cherry, with whom she had a close relationship. Nettie first mentioned the possibility of making changes to her will while she and Cherry were going to the hospital for the August admission. Nettie confided that she was considering giving her house to Alicia and Shawn, her niece and nephew-in-law.
*752 Cherry supported the idea and reassured Nettie that an attorney could help her prepare a will.
The day after being discharged home, Nettie had a meeting at her house with Serigne, Cure, and their spouses. Sitting in a wheelchair, Nettie told the two EBI executives that she was thinking about leaving the rest of her Class A units to her nephew, Troy. Serigne, who Lynn Dean had once considered the most important person to the success of EBI, expressed reservations about working for Troy and said he would talk to Troy about the situation. Over the next two days, Serigne, Cure, and Troy had extensive discussions to, as described by Serigne, "come to a working arrangement ... [as to] how Nettie would ultimately distribute her Class A voting units." During their final meeting, which took place at EBI, the three "came up with a plan on how the A [units] would be left." During these discussions, Serigne and Cure never disclosed to Troy that Nettie had already donated 1,000 of the Class A units to each of them.
This final meeting was interrupted when someone informed them Nettie needed a notary at her house. Serigne, Cure, and Troy went directly to Nettie's house. The testimony is conflicting about whether Serigne and Cure were invited to the house-they testified they were told to get a notary and get to the house, while Cherry testified she specifically told them not to come to the house.
They arrived to find Nettie lying on a mattress on her living room floor. In addition to Cure, Serigne, and Troy, several other people were in the house that morning, including Cherry; Alicia; Lynn Dean, who was suffering from severe dementia; Jacquelyn Dean, who was approximately 84 years old; Carl Heck Jr., a notary who previously had done work for the Dean family; and Gregory Schwab, Heck's nephew and an attorney with experience in preparing wills. Serigne had contacted Heck, who in turn called Schwab.
At some point Cure said, "All right, let's get started" and began asking Nettie what she wanted in her will, taking notes while she spoke. The nature of Cure's interaction with Nettie is disputed; Cure testified he was merely ensuring Nettie's will would reflect her wishes, while Cherry testified that Cure was "standing over" Nettie and "feeding numbers to her," which prompted Cherry to ask him to stop.
Schwab, who was also involved in the discussions with Nettie, returned to his office with Heck and prepared drafts of the August will. When they returned to Nettie's house, they were met on the front porch by Cure, who reviewed the drafts of the will and made some corrections. Schwab proceeded to review the will with Nettie, with the following people present: Serigne, Cure, Troy, Alicia Nettles, Mr. and Mrs. Dean, and Heck, and Nicole LeBouef, the Human Resources Manager for EBI, who was called by Serigne to be a witness to Nettie's will. Cherry was not present in the room. After being awake most of the night with Nettie, Cherry had fallen asleep in a back bedroom. Nettie asked for Cherry but was told she was asleep. When Schwab finished, he asked Nettie if the instrument correctly reflected her last wishes, and Nettie said yes. With her mother's help, Nettie signed the will.
After hearing testimony from numerous witnesses, including several experts, the trial court found Nettie had testamentary capacity when she executed the August will, but the legacies to Serigne, Cure, and Serigne's daughter, Kristina Henderson, were the subject of undue influence and were void. A judgment was signed on November 7, 2016, declaring the legacies to Serigne, Cure, and Henderson to be null and void. Serigne, Cure, and Henderson *753 appeal, assigning as error the trial court's (1) finding of undue influence and the annulment of the involved legacies, (2) denial of an exception of no right of action filed in response to Cherry's petition of intervention, (3) denial of a motion to remove Cherry as independent executrix, and (4) assessment of all costs to appellants.
DISCUSSION
Undue Influence
Pursuant to Louisiana Civil Code article 1479, a donation inter vivos or mortis causa shall be declared null upon proof "that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor." Such undue influence can result from physical coercion and duress, or more subtle influences such as creating resentment toward a natural object of a testator's bounty by false statements. See La. Civ. Code art. 1479, Revision Comment (b); In re Succession of Fisher , 06-2493 (La. App. 1 Cir. 9/19/07), 970 So.2d 1048, 1056. Mere advice, persuasion, or kindness and assistance should not constitute influence that would destroy the free agency of a donor and substitute someone else's volition for his own. See La. Civ. Code art. 1479, Revision Comment (b); Succession of Fisher , 970 So.2d at 1056.
The influence may be exerted by the donee himself or by a third person, even under circumstances where the donee takes no part in the activities and may be unaware of them, as long as some person exercises control over the donor, presumably one who is interested in the fortunes of the donee. See La. Civ. Code art. 1479, Revision Comment (c); Succession of Himel v. Todd , 11-1638, 2012 WL 2921495, p. 4 (La. App. 1 Cir. 7/17/12), writ denied , 12-1878 (La. 11/9/12), 100 So.3d 839. While the influence must be operative at the time of the execution of the donation or testament, it is not necessary the acts themselves be done at that time, or the person exercising the pressure be present then. See La. Civ. Code art. 1479, Revision Comment (d); Succession of Himel, 2012 WL 2921495 at p. 4. When a donation is declared null because of undue influence, it is not necessary that the entire act of donation or testament be nullified. If any provision contained in it is not the product of such means, that provision shall be given effect, unless it is otherwise invalid. See La. Civ. Code art. 1480.
Generally, a person who challenges a donation because of fraud, duress, or undue influence must prove it by clear and convincing evidence. However, if at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the alleged wrongdoer and the alleged wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence. See La. Civ. Code art. 1483 ; Succession of Fisher , 970 So.2d at 1056. Here, Serigne and Cure do not contest they had a relationship of confidence with Nettie, arising out of many years of working together as executives for EBI, and they are not related to Nettie. Thus, the burden of persuasion for proving undue influence in this case is a preponderance of the evidence. See La. Civ. Code art. 1483.
A trial court's finding of undue influence is fact intensive and cannot be disturbed on appeal in the absence of manifest error. See In re Succession of Alexander , 15-0722, 2015 WL 6951416, p. 4 (La. App. 1 Cir. 11/9/15) ; Succession of Himel , 2012 WL 2921495 at p. 6. Under *754 the manifest error standard of review, a reviewing court may not merely decide if it would have found the facts of the case differently. Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC , 14-2592 (La. 12/8/15), 193 So.3d 1110, 1115. Rather, to reverse a trial court's factual conclusion, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. Hayes , 193 So.3d at 1115-16 ; Stobart v. State through Department of Transportation and Development , 617 So.2d 880, 882 (La. 1993). This test requires a reviewing court to do more than simply review the record for some evidence that supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous.[3] Hayes , 193 So.3d at 1116 ; Stobart , 617 So.2d at 882.
The trial court received testimony from eighteen witnesses, including four experts. The testimony covered a wide spectrum of information, including the formation, structure, and control of EBI; Nettie's involvement in the company and her respective relationships with the subject parties; Nettie's health and interactions with the parties in the last days of her life; and the actual drafting and execution of the August will.
Some facts are not in dispute. The dire state of Nettie's health in the last two weeks of her life was uncontroverted. She had metastatic cancer that had spread to her brain, which was very swollen. According to her treating neurosurgeon, Nettie's brain was functional but not functional in a normal way; the disease likely impaired her judgment and memory. When she returned home from her final hospital admission on August 17, 2010, she was unable to walk into her house and fell on the front steps. Her condition deteriorated rapidly between August 17th and August 20th. Although she could answer questions and converse, Nettie was having trouble with hearing, following commands, and understanding numbers. She was frequently disoriented, would lose her train of thought, and hallucinated on one occasion. To make matters worse, Nettie had painful shingles on her face and scalp. After falling out of bed during the night of August 19th and being moved to a mattress on her living room floor, Nettie woke the next morning and told Cherry she did not think she would live through the day. By that time, Nettie, according to her mom, was "pretty helpless" and "was not our Nettie." Medical experts called by both sides agreed Nettie's condition made her susceptible to undue influence.
It is also undisputed that Serigne and Cure, the CEO and vice-president, respectively, for EBI, met with Nettie at her house, at her invitation, on Wednesday, August 19, 2010, at which time Nettie informed them she was considering leaving her Class A units to her nephew, Troy. Serigne readily conceded at trial that he did not want Troy to get Nettie's remaining Class A units. Serigne's desire to control operations of EBI was well known and established. In 2005, Serigne informed Lynn Dean he would remain with the company *755 only if he had total control and an ownership interest. As a result, Serigne was promoted from chief engineer to CEO, replacing Mrs. Dean's son, Douglas, as the company's top executive. Believing control of the company depended on the disposition of Nettie's units, Serigne responded to Nettie's announcement by expressing reservations about working for Troy, stating, "I don't know if I'm ready to work under Troy or anyone else in the family." Serigne said he would talk to Troy about the situation.
After the meeting with Nettie, Serigne called Troy and had a lengthy conversation about the matter. That conversation was followed by a second telephone conversation and two meetings with Troy, all for the purpose, as confirmed by Serigne, "to come to a working arrangement ... as to how ... Nettie would ultimately distribute her Class A voting units." Cure similarly confirmed that he and Serigne "wanted a different disposition" of the Class A units; so Serigne, Cure, and Troy "came up with a plan on how the A shares would be left." Throughout these discussions, Troy erroneously believed they were talking about a division of all of the Class A units; at no time did Serigne or Cure ever disclose that Nettie had already donated 2,000 of the units to them.
A meeting was arranged with Nettie on Friday, August 20, 2010; however, prior to that meeting, Serigne, Cure, and Troy were meeting at EBI to discuss the matter, when they were informed Nettie needed a notary at her house. At this point, the testimony becomes conflicting.
Cure and Serigne testified Cherry came to EBI to communicate this information and instructed them to get a notary. Troy testified someone, he could not remember who said Nettie was going to die and wanted to write a will. Cherry unequivocally denied leaving Nettie's house that morning and said she spoke to Cure by telephone, informing him that a business meeting that day, apparently scheduled at Nettie's house, was canceled. Cherry further testified she told them, "Please don't come back here today. Nettie needs to write a new will." Shortly thereafter, Serigne, Cure, and Troy appeared at the house.
Troy found the March will, and Cure pointed out where the will left all of Nettie's Class A units to Troy. Schwab arrived and, while still on the front porch, was provided a copy of the March will and had a discussion with Cure. While Schwab could not remember the exact details of their conversation, he said he likely "got some numbers from Walter [Cure] before I saw Nettie" and "may have gotten some information from Walter concerning what her intentions were." Once inside, Cure took the initiative, declaring, "All right, let's get started. Nettie is ready." With a notebook in hand, Cure stood over Nettie and asked her what she wanted to put in her will. The events unfolding thereafter, particularly the extent of Cure's involvement, are disputed.
Cure described his role as more passive, stating he merely wanted to ensure "Nettie got exactly what she wanted in her will." Cure acknowledged he did not remind Nettie, nor disclose to anyone else in attendance, that she had already donated 2,000 of her Class A units to him and Serigne. Cure also admitted he "reminded" Nettie about a bequest to Serigne's daughter, Kristina Henderson, by asking Nettie "if she still wanted" to leave some Class B units to Henderson. Cure reviewed Schwab's draft of the August will and made corrections to it, including increasing the number of Class B units bequeathed to Henderson from 800 to 840. Cure's description of his involvement in the process *756 was largely corroborated by Serigne, Schwab, and Heck.
Schwab testified he spoke to Nettie and, working from the March will, took notes and developed an understanding of the changes she wanted to make to her will. He never heard anyone tell Cure to stop what he was doing. Schwab went back to his office, drafted the August will, and returned to Nettie's house. According to Schwab, he reviewed the revisions with Nettie in private when Cure was not in the room, but Serigne testified there were always people in the room, "a lot of people in a small room." Several copies of the final draft of the will were distributed to the people in the room, and Schwab read the will to Nettie. At some point during the reading of the will, Nettie asked for Cherry and was told she was sleeping. When Schwab finished reading the will, Nettie acknowledged it was her final will and, with her mother's help, signed the instrument.
Troy, who at the time of trial was an employee under Serigne at EBI, testified he had no knowledge of any duress exerted upon Nettie, but qualified that statement in the following exchanges:
A. Yes. I don't necessarily think she understood the results of the will. I think she understood the decision she was making at the time.
Q. Well, what result do you think she didn't understand?
* * *
A. I don't think she understood that... equally splitting the [Class A] shares would not mean equally among the five. At that time, that was my thought. I thought ... equally among the five [meant] the five would all be equal.
Q. At that time you weren't aware about the prior 1,000 unit donations to each Ken [Serigne] and Walter [Cure]?
A. Correct. At that time, even through all of the conversations I had with Ken and Walter, I thought Aunt Nettie had them all, 8,000 being them all. That's what I thought.
* * *
Q. You know there have been allegations in the litigation that Ken and/or Walter may have influenced Nettie unduly regarding some of the terms of the new will. There may have been some fraud, some duress. Do you have any knowledge of anything like that?
A. I don't have any knowledge of anything of that nature. What I do believe I have knowledge of is mathematically ... Ken and Walter knew what the results would be [of equally dividing] the 8,000 shares. I believe the two men are smart enough to understand what the outcome would be when and if [the bequest] was executed.
Cherry's testimony differed significantly from Cure's description of his involvement in the preparation and execution of the will. According to her, Nettie began by addressing bequests unrelated to the EBI units, first stating she wanted to leave her house to her niece, then addressed some other bequests, such as her car, until Cure shifted focus to the EBI units. Cure began suggesting bequests to Nettie and insisting, "This is what you want to do, right, Nettie?" Cherry further testified:
A. I felt that he was actually feeding numbers to her at that point, telling her, you know, 'Okay, we got extras. If there's extras, are we going to give them to Ken and I?' [Nettie then replied,] 'Sure that's fine, you know.'
Q. Did you feel like the answers Nettie was giving were more of just Nettie being agreeable or?
*757 A. Agreeing, agreeing with Walter, someone that ... was in a position of trust for her.
Q. Or was Nettie making decisions do you think?
A. I don't think Nettie was making decisions. I think the only decision she was making was about the house, you know. That house was what weighed on her mind [because she] want[ed] somebody in there that will take care of [her] parents.
According to Cherry, Cure's actions were so intrusive that Cherry yelled, "Stop. You and I cannot witness this, or we'll actually create an invalid will." She did not believe Cure, particularly as a beneficiary, "could have any part in making the will." Cure appeared to be "putting into motion a new will" and was in control of the situation. Cherry testified, "I didn't feel that we had-we could do what he was doing." Exhausted from being awake several nights tending to Nettie, Cherry left the room and fell asleep in a back bedroom.
Other witnesses testified generally about Nettie's mental condition shortly before or after she executed the will. Kaleher, who stayed with Nettie several nights before she signed the will, testified that Nettie was disoriented, would lose her train of thought, and hallucinated once. Nettie's sister, Lenda, arrived the night after Nettie signed the will, and she testified Nettie was having memory problems and "wasn't making sense." Margaret Chinn visited Nettie the following day, and Nettie hallucinated, saying she could see a man riding a motorbike on the ceiling fan.
Three expert witnesses gave opinions concerning undue influence. Dr. Michael Chafetz, an expert in clinical neuropsychology, reviewed Nettie's medical records, depositions of parties and witness, and interviewed Cherry. Based upon that information, Dr. Chafetz concluded Nettie was subjected to undue influence. Among other factors, Dr. Chafetz cited Serigne's veiled threat to leave the company if Troy received the Class A units, Cure's actions and statements at Nettie's bedside on the day the will was executed, the complete departure from Nettie's prior will with respect to the disposition of the Class A units, and her predisposition to undue influence stemming from her medical condition. Dr. Jill Hayes, an expert in clinical and forensic neuropsychology, offered similar testimony and likewise concluded Serigne and Cure subjected Nettie to undue influence. Dr. John Thompson, an expert in forensic psychiatry called by the defendants, did not find significant indicia of undue influence, although he cautioned that the determination of undue influence is "an issue for the trier of fact." He agreed Nettie was vulnerable to undue influence and acknowledged her medical condition, the significant change from her prior will, as well as her close relationship with Serigne and Cure, are relevant considerations in making the undue influence determination.
The appellants contend the evidence does not establish a level of influence that "so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor," as required by Article 1479. For support, they cite the testimony of several witnesses, including Schwab, Heck, Serigne, Cure, and LeBouef, who testified they saw nothing to suggest undue influence on the day Nettie signed the will. However, the record contains contrary evidence.
Cherry described Cure "feeding numbers" to Nettie, controlling the situation, and effectively putting into place a new will, something much more expansive than what Nettie had expressed to Cherry about merely changing the bequest of *758 her house. Her testimony portrays a strong degree of influence and control by Cure over Nettie, "leading her into what he wanted" for the disposition of the EBI units. These actions were undertaken under circumstances conducive to undue influence.
The medical experts agree Nettie's condition made her vulnerable to undue influence. In that state of mind, Nettie was told by Serigne that he was uncertain he would continue to work for EBI if she gave her Class A units to Troy. Through a series of conversations and meetings, Serigne, Cure, and Troy came to an agreeable arrangement for how they wanted Nettie to divide her Class A units. Cure acknowledged that once they learned Nettie was writing a new will, the only way they could get her Class A units was through her will. Serigne and Cure went immediately to Nettie's house, although according to Cherry they were specifically told not to come to the house. Even if initially asked to arrange for a notary, neither Serigne nor Cure could adequately explain why they remained at Nettie's house during what is typically a very private endeavor, the preparation and execution of a will. At trial, when pressed on the matter, Serigne only offered, "I don't know. Maybe it would have been more polite to leave now that you asked me that." Serigne and Cure did not leave, and, as a result, Nettie executed a will in what can only be described as less than ideal circumstances to protect against undue influence: she was surrounded by the individuals who benefitted the most from the changes she was making to her prior will.
Serigne and Cure deny any incentive to influence Nettie's disposition of her Class A units, arguing their existing status as Class A members vests them with the ability, under EBI's operating agreement, to block the admission of any new Class A member. According to this argument, they effectively control the operation of the company regardless of who receives Nettie's Class A units. However, the record readily establishes that at the time Nettie executed the August will, Serigne and Cure, correctly or not, believed they needed a majority of the Class A units to control the operations of EBI. Serigne testified he thought Troy would have control of the company if Troy got Nettie's Class A units. Cure gave similar testimony. That perception on their part prompted the extensive telephone conversations and meetings with Troy to come to a "working arrangement" to allocate the units.
The appellants also dispute whether the August will was a departure from Nettie's previous plans to dispose of her Class A units, arguing the aberration is the March will, which bequeathed the Class A units to Troy. Multiple witnesses testified Nettie consistently expressed a desire to keep control of EBI in the Dean family. Lenda confirmed Nettie, like her father, strongly believed control of the company should always be vested in the family, preferably with one person. In their last conversation about the matter, Nettie said Troy would be that person. In the summer of 2010, Nettie similarly told her uncle, William Miles, she wanted Troy to run EBI. The March will is consistent with those stated intentions. In contrast, the bequest in the August will, if executed, would result in a majority of the Class A units being owned by non-family members.
The trial court heard contrasting descriptions of Cure's statements and demeanor in his interaction with Nettie while she made changes to her will. Based upon our review of the extensive evidence, the trial court's factual finding of undue influence is not manifestly erroneous or clearly wrong. The finding is reasonably supported by testimony from numerous witnesses, *759 both fact and expert, who testified about Nettie's vulnerable condition, the desire of Serigne and Cure to control the disposition of her units in EBI, the opportunities to exert influence on Nettie toward that end, and the measures undertaken by Serigne and Cure to accomplish that objective. While the testimony was conflicting as to the degree of influence exerted, when findings are based on determinations of credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of the trier of fact; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. See Hayes , 193 So.3d at 1116. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Hayes , 193 So.3d at 1116. The assignment of error challenging the trial court's finding of undue influence is without merit.
The appellants make additional assignments of error and arguments specific to the bequests of the Class B units to Serigne, Cure, and Henderson, asserting the petitions did not allege any undue influence with respect to those bequests, no evidence was introduced to support any such finding, and, with respect to Henderson, she was not a defendant in the proceeding and was never served.
Lenda's petition details the circumstances surrounding the execution of the August will, including Nettie's medical condition; the relationship of confidence between Serigne, Cure, and Nettie; and the involvement of Cure in drafting the will. The petition further alleges Cure, through fraud, duress, or undue influence, caused Nettie to execute the August will. While the petition alleges the will results in Serigne and Cure acquiring a majority interest in the voting stock of EBI, the petition's request for relief is not limited to that bequest. Instead, the petition requests the entire will be declared null. The executor of Lenda's succession later amended the petition to specifically name a number of defendants, including Henderson. In an answer to the amended petition, Henderson reiterated an exception of no right of action and denied the allegations of the petition. Henderson appeared numerous times in subsequent pleadings and was represented by counsel at the trial of the matter.
Louisiana uses a fact-based system of pleading. See Udomeh v. Joseph , 11-2839 (La. 10/26/12), 103 So.3d 343, 348. Under Louisiana Code of Civil Procedure article 862, except in cases of a default judgment:
[A] final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief.
Article 862 permits courts to render substantive justice on the basis of facts pled and to refuse to permit a denial of substantive rights due to technical defects of language or characterization of the case. Udomeh , 103 So.3d at 348-49. If the facts constituting the claim or defense are alleged or proved, the party may be granted any relief to which he is entitled under the fact-pleadings and evidence. Udomeh , 103 So.3d at 349. Due process, however, requires adequate notice to the parties of the matters to be adjudicated. Id.
The petition filed by Lenda, as amended, alleged sufficient facts to give Serigne, Cure, and Henderson adequate notice that Lenda challenged the validity of all bequests in the August will. The evidence of undue influence presented at trial was sufficiently broad to encompass all bequests *760 that benefitted Cure, Serigne, or Henderson, who is Serigne's daughter. Cherry's testimony describing Cure's conduct was not limited to the particular bequest of the Class A units. Cure acknowledged that in his bedside communications with Nettie, he brought up the legacy to Henderson and later "corrected" the draft of the will to increase the actual number of units bequeathed to Henderson. Henderson was named as a defendant in the amending petition, answered the petition, and appeared at trial through counsel. The assignments of error seeking reversal of the nullification of the legacies of the Class B units are without merit.
Denial of Exception of No Right of Action
The appellants assert the trial court erred in denying an exception of no right of action asserted in response to the amended petition for intervention filed by Cherry, in her capacity as independent executrix. In the amended petition, Cherry joined Lenda's challenge of the August will and alleged its invalidity due to Nettie's lack of capacity or because of undue influence. In support of their exception of no right of action, Serigne and Cure argue that Cherry, in her capacity as the independent executrix, is obligated to defend the August will and has no procedural right or standing to attack it.
The function of the exception of no right of action is to determine whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit. Eagle Pipe & Supply, Inc. v. Amerada Hess Corporation , 10-2267 (La. 10/25/11), 79 So.3d 246, 255 ; see also La. Code Civ. Pro. arts. 927A(6) and 1034. The exception assumes that the cause of action asserted is valid and tests whether the plaintiff has an interest in judicially enforcing it. JP Morgan Chase Bank, N.A. v. Boohaker , 14-0594 (La. App. 1 Cir. 11/20/14), 168 So.3d 421, 426. Whether a plaintiff has a right of action is a question of law and is reviewed de novo on appeal. Eagle Pipe and Supply, Inc. , 79 So.3d at 256.
Generally, a succession representative is the proper plaintiff to sue to enforce a right of the deceased or of his succession, while the latter is under administration. See La. Code Civ. Pro. art. 685 ; see also La. Code Civ. Pro. art. 3211 ; La. Civ. Code art. 2315.1B. In the performance of her duties, a succession representative may exercise all procedural rights available to a litigant. La. Code Civ. Pro. arts. 3196. A succession representative's procedural rights are thus largely defined by the duties imposed on her by law. Those duties, which are fiduciary in nature, include but are not limited to the duty of collecting, preserving, and managing the succession property; the duty to enforce all obligations in favor of the succession; and the duty to close the succession as soon as advisable. See La. Code Civ. Pro. arts. 3191, 3211, 3221, and 3197.
The duty of the executor in a will contest has been the subject of several cases, most often in the context of determining whether the executor can be reimbursed from the estate for attorney fees incurred in the dispute.[4] Although the attorney fee *761 issue is not presently before this court, this jurisprudence is helpful in defining the duties and corresponding procedural rights of an executor in a will dispute.
Typically, a person named executor in a will has a duty to offer the will for probate, to defend it from attack, and to endeavor to have it executed; and, as that duty results from the act of the testator, the expenses, such as fees of counsel and costs of court incurred in its discharge, should generally be borne by the testator's succession. See In re Marshall's Estate , 149 La. 300, 303, 88 So. 914, 915 (1921) ; Succession of Filhiol , 123 La. at 509-10, 49 So. at 143 ; Succession of Bradford , 130 So.2d at 706. The jurisprudence, however, has carved out exceptions to this general rule, denying reimbursement of attorney fees where (1) the succession representative, in her individual capacity as a legatee under the will, was the primary beneficiary of the attorney's services; or (2) the succession representative, knowing the will to be invalid, made a bad faith effort to probate it. See In re Succession of Horrell , 89 So.3d at 1269 ; Succession of Bradford , 130 So.2d at 707-08 ; Succession of Morere , 3 Teiss. 155, 160 (La. Orleans App. 1906) (on rehearing).[5] Neither of these exceptions is applicable in this case.
While the duty of an executor to file and, in most instances, defend a will is well-settled, the same cannot be said about an executor's right or duty to challenge the validity of the decedent's will. This court recently held a succession representative has no such duty. See In Succession of Reno , 15-0854 (La. App. 1 Cir. 9/12/16), 202 So.3d 1147, 1155, writ denied , 16-2106 (La. 2/10/17), 215 So.3d 701. The administrator in Succession of Reno sought reimbursement from the decedent's estate for attorney fees incurred, in part, to challenge the decedent's last will. Denying recovery, this court explained:
As administrator of the estate, [the succession representative] is not to assume the judicial role of determining which will is valid; his role is to produce the will for probate, leaving to any interested party the onus of impeaching its validity.
Succession of Reno , 202 So.3d at 1155.
The opposite conclusion was reached in Matter of Succession of Scott , 12-0350, 2013 WL 12114718 (La. App. 1 Cir. 3/6/13), writ denied , 13-0720 (La. 5/17/13), 118 So.3d 372, wherein this court held a co-executor, who acted in good faith, had the procedural capacity to pursue an action to annul the testator's last will and testament, and was entitled to reimbursement from the estate for attorney fees incurred in connection therewith. Succession of Scott , 2013 WL 12114718 at pp. 7-8. The court relied heavily on the jurisprudence, discussed above, establishing that an executor who attempts to probate an invalid testament in had faith is not entitled to reimbursement from the estate for his attorney fees. See Succession of Scott , 2013 WL 12114718 at pp. 9-12. Based on that premise, the court ostensibly reasoned that the opposite must also be true: an executor who acts in good faith , regardless of whether he is defending or attacking a will, is entitled to reimbursement of his attorney fees and has the procedural capacity to pursue the claim. Thus, under Succession of Scott , an executor's right to contest the validity of the decedent's will is *762 determined, at least in part, by the good or bad faith of his actions.
Having reviewed the applicable law, we find no statutory authority vesting an executor in his official capacity with the right or duty to challenge the validity of the decedent's last will and testament, even if the executor's actions are taken in good faith. An executor's duties are granted and defined by positive law; however, the applicable articles of the Code of Civil Procedure contain no language expressly or impliedly creating a duty on the part of an executor to pursue a legal challenge of the decedent's will. In fact, such a challenge is contrary to express duties imposed on an executor.
An executor is a fiduciary with respect to the succession. La. Code Civ. Pro. art. 3191. In that capacity, he is duty bound to collect, preserve, and, as soon as advisable, close the succession, transmitting the property in the decedent's estate to his successors. See La. Code Civ. Pro. arts. 3191, 3211, 3221, and 3197 ; La. Civ. Code. art. 871. The decedent's successors in a testate succession are identified in his last will and testament. The will is presumed valid, and the testator is presumed competent. See In re Succession of Holbrook , 13-1181 (La. 1/28/14), 144 So.3d 845, 853 ; In re Succession of Bellande , 13-0578, 2013 WL 7122700 p. 2 (La. App. 1 Cir. 12/27/13), writ denied, 14-0615 (La. 4/25/14), 138 So.3d 1233. Thus, a challenge to the decedent's will is a challenge to the document that presumptively identifies the successors to whom the executor is obliged to transmit the estate. Inevitably, any pleading filed by the executor seeking to invalidate that instrument creates a conflict of interest between himself and those successors.[6]
Cherry has not identified any statutory duty or right allowing her, in her capacity as independent executrix, to file a claim seeking to invalidate Nettie's last will and testament, or any particular legacies therein. Absent such authority, Cherry, in her capacity as the independent executrix, has no procedural right to assert the claim. See La. Code Civ. Pro. art. 3196 ; Succession of Reno , 202 So.3d at 1155-56. The trial court erred in denying the exception of no right of action filed by the appellants in response to the amended petition for intervention filed on behalf of Cherry, in her capacity as the independent executrix. The exception is sustained, and the executrix's claims contesting the validity of the August will and any legacies therein are dismissed with prejudice. To the extent inconsistent with our holding herein, Succession of Scott is hereby overruled.
Denial of Motion to Remove Independent Executrix
The appellants also assign as error the trial court's denial of their motion to remove Cherry as the independent executrix. For grounds, they primarily rely on the fact Cherry challenged the validity of Nettie's final will.
A party seeking removal of a succession representative must prove by convincing evidence that the representative either breached his fiduciary duty to the succession under Louisiana Code of Civil Procedure article 3191 or the existence of one of the grounds for removal enumerated in Louisiana Code of Civil Procedure article 3182.
*763 In re Succession of LeBouef , 13-0209 (La. App. 1 Cir. 9/9/14), 153 So.3d 527, 534 (en banc ). Under Article 3182, the court may remove any succession representative who is or has become disqualified, has become incapable of discharging the duties of his office, has mismanaged the estate, has failed to perform any duty imposed by law or by order of court, has ceased to be a domiciliary of the state without appointing an agent as provided in Louisiana Code of Civil Procedure article 3097(4), or has failed to give notice of his application for appointment when required under Louisiana Code of Civil Procedure article 3093.
A trial court is authorized to remove a representative only after such a showing is made. Succession of LeBouef , 153 So.3d at 534. At that point, the trial court is vested with discretion in determining whether removal of a succession representative is appropriate under the particular facts. Absent an abuse of discretion, the trial court's decision regarding removal of a succession representative will not be disturbed on appeal. Succession of LeBouef , 153 So.3d at 534.
At the hearing on the motion, four witnesses testified. Alicia Nettles confirmed she and her husband moved into Nettie's house, apparently prior to being formally placed into possession of it; however, as she explained, they occupied the home to help take care of Mr. and Mrs. Dean, who live in an adjoining home. Douglas Dean testified he secured Nettie's travel trailer and later turned it over to his daughter, Alicia Nettles, who inherited the trailer under the August will. Todd Villarrubia, an attorney who previously represented Cherry as independent executrix, testified Cherry was very helpful in compiling the information necessary to administer the succession and in communicating with family members, adding:
Yes, she was outstanding. You know, I [have] been at this for twenty years, and I've had the gamut .... I mean every week you know there were meetings at my office, there were phone calls, there were family members that were coming in asking questions about all this, and I think she did an outstanding job with it.
Cherry testified she initially worked more than forty hours per week on the succession. She has not requested or received any compensation for her work. The estate has grown in value during the administration. As to the August will, Cherry decided to join Lenda's nullity action after she learned of Dr. Smith's deposition testimony and in reliance on her own observations. Cherry acknowledged that her attorney fees related to the litigation have been paid by the estate, but no evidence was introduced to establish the amount of those fees; or, just as importantly, how much of the fees were specifically incurred by Cherry solely for the purpose of pursuing the nullity action asserted in her amended petition of intervention. The principal nullity action that gave rise to this proceeding was filed by Lenda. Cherry, as the independent executrix, is a named defendant in that action and undoubtedly incurred attorney fees in connection with the litigation of Lenda's claim. In light of that claim, attorney fees may have been incurred by Cherry even if she had not improperly assumed the role, through the filing of the amended intervention, of a plaintiff in the nullity action.
The evidence does not establish any mismanagement of the estate by Cherry. While Cherry did not have the procedural right to assert a nullity action in her capacity as independent executrix, the assertion of that claim, alone, is not sufficient to compel her removal as independent executrix, particularly given the unsettled nature of the previous jurisprudence addressing *764 the rights and duties of a succession representative to challenge the validity of the decedent's will. The trial court did not abuse its discretion in denying the motion to remove Cherry as independent executrix. This assignment of error has no merit.
Assessment of Costs
In their final assignment of error, Serigne and Cure assert the trial court erred in casting them with all costs of the proceeding, arguing they "were successful in defending the will."
The trial court may render judgment for costs, or any part thereof, as it may consider equitable. See La. Code Civ. Pro. art. 1920 ; Gillio v. Hanover American Insurance Company , 16-0640 (La. App. 1 Cir. 1/31/17), 212 So.3d 588, 595, writ denied , 17-0393 (La. 4/24/17), 219 So.3d 1098. While the general rule is that the party cast in judgment should be assessed with court costs, the trial court may assess costs in any equitable manner and against any party in any proportion it deems equitable, even against the party prevailing on the merits. Bourg v. Cajun Cutters, Inc. , 14-0210 (La. App. 1 Cir. 5/7/15), 174 So.3d 56, 73, writs denied , 15-1306 (La. 4/4/16), 190 So.3d 1201, 1205. An appellate court will not disturb the trial court's assessment of costs absent an abuse of the sound discretion afforded the trial court. Bourg , 174 So.3d at 74.
The litigation focused on Nettie's bequests of her ownership units in EBI. While the trial court denied the claim that Nettie lacked testamentary capacity when she executed the August will, the trial court struck the legacies of the EBI units to Serigne, Cure, and Henderson based on a finding of undue influence. Under these circumstances, the trial court did not abuse its discretion by casting Serigne and Cure with all costs.[7]
CONCLUSION
The November 7, 2016 judgment is affirmed. The trial court's denial of the motion to remove the independent executrix is also affirmed. The trial court's denial of the exception of no right of action, filed in response to the first amended petition of intervention, is reversed; the exception is sustained; and the claims set forth in the amended petition of intervention are dismissed with prejudice. All costs of this appeal are assessed to Ken Serigne, Walter Cure, and Kristina Henderson.
NOVEMBER 7, 2016 JUDGMENT AFFIRMED; DENIAL OF MOTION TO REMOVE INDEPENDENT EXECUTRIX AFFIRMED; DENIAL OF EXCEPTION OF NO RIGHT OF ACTION REVERSED, EXCEPTION SUSTAINED, AND FIRST AMENDED PETITION OF INTERVENTION DISMISSED WITH PREJUDICE.
Chutz, J. concurs and assigns reasons
McClendon, J. concurs and assigns reasons
Pettigrew, J. Dissents and assigns reasons
Holdridge J. concurs for the reasons assigned
McDonald, J. agrees and assigns additional reasons.
Guidry, J. Dissents in part and assigns reasons.
McDONALD, J., agreeing with additional reasons:
*765 I agree with the majority in this matter and suggest these facts clearly highlight the reason an executor should not have a right to challenge the validity of the testament that appointed them. In this case the March 29, 2010 testament greatly favors Troy Dean over Nettie's other nephews, Luke Dean and Cy Dean. All three are also nephews of Cherry, the executrix. We do not know what kind of relationship Cherry has with these nephews. However, in choosing one testament over the other, she could be accused of favoritism since each testament is so different from the other. In challenging the validity of the August 20, 2010 testament she is favoring Troy over the other nephews as well as over Serigne and Cure. Whether she actually favors him over the others is not clear, but the appearance is the same.
McCLENDON, J., concurs.
Based on the specific facts of this case, I concur with the majority in affirming the trial court's decision not to remove the executrix. However, I note that an action by an executor or executrix, in their individual capacity, challenging any portion of the testament that appointed them, may be in breach of his or her fiduciary duty with respect to the succession. Nevertheless, this issue is not before us.
HOLDRIDGE, J., CONCURS.
I respectfully concur in the result. I find that the testator, Nettie Dean, lacked testamentary capacity when she signed, with the assistance of her mother, the August 20, 2010 will. Since the entire August 20, 2010 will should be declared invalid, the arguments as to the bequests to defendants are moot. Similarly, the argument to remove Cherry Dean as executrix of the August will is moot since Cherry Dean was properly named executrix in the valid March 29, 2010 will of Nettie Dean.

Other new legacies not at issue herein include a car to Margo Carambat, books to Lenda, and a cargo trailer to EBI.

The appellants contend a de novo standard of review should apply because the trial court employed incorrect principles of law in making the undue influence determination. Specifically, they assert the trial court misstated the applicable burden of proof and did not consider all of the evidence. These assertions have no merit. In its reasons for judgment, the trial court correctly recited the applicable law and provided an extensive overview of the evidence presented.

See Succession of Filhiol , 123 La. 497, 49 So. 138 (1909) ; In Succession of Reno , 15-0854 (La. App. 1 Cir. 9/12/16), 202 So.3d 1147, writ denied , 16-2106 (La. 2/10/17), 215 So.3d 701 ; Matter of Succession of Scott , 12-0350, 2013 WL 12114718 (La. App. 1 Cir. 3/6/13), writ denied , 13-0720 (La. 5/17/13), 118 So.3d 372 ; In re Succession of Hendricks , 13-1766, 2014 WL 5800310 (La. App. 1 Cir. 11/7/14) ; In re Succession of Horrell , 11-1577 (La. App. 4 Cir. 4/18/12), 89 So.3d 1267, writ denied , 12-1348 (La. 9/28/12), 98 So.3d 846 ; Succession of Kilpatrick , 356 So.2d 1083 (La. App. 2 Cir.), writ denied , 359 So.2d 198 (La. 1978) ; Succession of Bradford , 130 So.2d 702, 706 (La. App. 2 Cir. 1961).

Louisiana Code of Civil Procedure article 2853 provides a means whereby a person in possession of a will of questionable validity can file the will with the court without vouching for its validity.

We further note that while the Code of Civil Procedure does not specifically identify who has the right to file an action to annul a will, the Code does mandate that the executor, if he has not been discharged, must be named as a defendant in any such proceeding. See La. Code Civ. Pro. art. 2931.

Appellants filed a motion to supplement the appellate record with pleadings filed in connection with the determination of the amount of recoverable costs. These pleadings were filed after the trial court granted the appeal from the judgment on the merits and are not relevant to the issues raised herein. The motion to supplement is denied. See Succession of LeBouef , 153 So.3d at 530, n.2.